# Exhibit 9

Deposition Transcript of Thomas
Buchanan (May 15, 2018)
*See* Dkt. 60-9

Page 1

1          THOMAS BUCHANAN - MAY 15, 2018
2            UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF TEXAS
3                 DALLAS DIVISION
4    THOMAS BUCHANAN, on        )
     behalf of himself and      )
5    all others similarly       )   CIVIL ACTION
     situated,                  )   NO.
6                               )
            Plaintiffs,         )   3:17-CV-00728-D
7                               )
     v.                         )
8                               )
     SIRIUS XM RADIO, INC.,     )
9                               )
            Defendant.          )
10   _____    )
11
12
13       VIDEO DEPOSITION OF THOMAS BUCHANAN
14               Dallas, Texas
15            Tuesday, May 15, 2018
16
17
18
19
20
21   Reported by:
22   KIM A. McCANN, RMR, CRR, CSR
23   JOB NO. 140826
24
25

1     THOMAS BUCHANAN - MAY 15, 2018

2

3                    May 15, 2018

4                    9:05 a.m.

5

6          Video deposition of THOMAS BUCHANAN,

7     held at the offices of Jones Day, 2727 N. Harwood

8     Street, Suite 500, Dallas, Texas, pursuant to the

9     Federal Rules of Civil Procedure before Kim A.

10    McCann, Registered Merit Reporter, Certified

11    Realtime Reporter and Certified Shorthand

12    Reporter in and for the State of Texas.

13

14

15

16

17

18

19

20

21

22

23

24

25

1      THOMAS BUCHANAN - MAY 15, 2018

2    A P P E A R A N C E S:

3

4    HUGHES ELLZEY

5    BY:  Jarrett Ellzey, Esq.

6    2700 Post Oak Blvd.

7    Houston, Texas 77056

8    Counsel for Plaintiffs

9

10

11

12

13    JONES DAY

14    BY:  Lee Armstrong, Esq.

15         Allison Waks, Esq.

16    250 Vesey Street

17    New York, New York

18    Counsel for Defendants

19

20

21

22    ALSO PRESENT:

23    Tyler Theis, General Counsel, Sirius XM Radio

24    Connor Bynum, Videographer

25

```
1            THOMAS BUCHANAN - MAY 15, 2018
2                    I N D E X
3                                              PAGE
4   THOMAS BUCHANAN
5        Examination By Mr. Armstrong              7
6        Examination By Mr. Ellzey               141
7
8                E X H I B I T S
9     NUMBER        DESCRIPTION              PAGE
```

```
10  Exhibit 1     Petition Small Claims Case,     12
                  Plaintiff Thomas Buchanan,
11                Defendant Sirius XM Holdings
12  Exhibit 2     Letter dated 7/24/16 from Thomas  21
                  F. Buchanan to Sirius XM Holdings
13
    Exhibit 3     Plaintiff's initial complaint    25
14                filed
15  Exhibit 4     Call detail log from AT&T home    69
                  service for Buchanans
16
    Exhibit 5     Free trial offer of Sirius XM    79
17                Radio to Deborah Buchanan
18  Exhibit 6     Plaintiff's Objections and       93
                  Answers to Sirius XM's First Set
19                of Interrogatories
20  Exhibit 7     Petition Small Claims Court     104
21  Exhibit 8     Email from Thomas Buchanan to   116
                  Tyler Theis of Sirius XM
22
    Exhibit 9     Resumé of Tom Buchanan, Bates   126
23                Buchanan 10 through 18
24  Exhibit 10    Owner's manual for 2011 Honda   133
                  Odyssey
25
```

1          THOMAS BUCHANAN - MAY 15, 2018

2                    INDEX (Cont.)

3    Exhibit 11   Manual for 2011 Honda Odyssey        138

              Touring and Touring Elite

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              THOMAS BUCHANAN - MAY 15, 2018
 2                    P R O C E E D I N G S
 3              THE VIDEOGRAPHER:  This is the start
 4    of media labeled No. 1 of the video recorded
 5    deposition of Thomas Buchanan in the matter of
 6    Thomas Buchanan on behalf of himself and all
 7    others similarly situated versus Sirius XM Radio,
 8    Incorporated, in the United States District Court
 9    of the Northern District of Texas, Dallas
10    Division, No. 3:17-CV-00728-E.
11              This deposition is being held Jones
12    Day in Dallas, Texas on Tuesday, May 15th, 2018,
13    at approximately 9:05 a.m.  My name is Connor
14    Bynum.  I am the legal video specialist from TSG
15    Reporting, Incorporated headquartered at 747
16    Third Avenue, New York, New York.  The court
17    reporter is Kim McCann in association with TSG
18    Reporting.
19              Counsel, please introduce yourselves.
20              MR. ARMSTRONG:  This is Lee
21    Armstrong.  With me is Allison Waks of Jones Day.
22    We represent Sirius XM.  Also with us is Tyler
23    Theis, who's the associate general counsel for
24    Sirius.
25              MR. ELLZEY:  Jarrett Ellzey for the
```

1          THOMAS BUCHANAN - MAY 15, 2018

2      plaintiff and the class.

3              THE VIDEOGRAPHER:  Will the court

4      reporter please swear in the witness.

5                      THOMAS BUCHANAN,

6      having been first duly sworn, testified as

7      follows:

8                      EXAMINATION

9      BY MR. ARMSTRONG:

10         Q.  Good morning, Mr. Buchanan.

11         A.  Good morning.

12         Q.  Have you testified before?

13         A.  No.

14         Q.  This is the first time you've had

15     your deposition taken?

16         A.  Yes.  I've never been deposed.

17         Q.  Okay.  So there's various sort of

18     ground rules.  I won't go through all of them

19     unless they're necessary, but one is it's

20     important, especially for Kim, that we not -- we

21     try our best not to talk over each other.  Okay?

22         A.  Okay.

23         Q.  So I'll ask a question and then you

24     provide an answer, and we try to give Kim enough

25     time to get both of us down.  Okay?

1        THOMAS BUCHANAN - MAY 15, 2018

2        A.  Okay.

3        Q.  All right.  So you just took an oath

4   to tell the truth, right?

5        A.  Yes.

6        Q.  And it's to tell the whole truth,

7   right?

8        A.  Yes.

9        Q.  Will you do that today?

10       A.  Yes.

11       Q.  Do you understand the consequences of

12   not telling the truth?

13       A.  Yes.

14       Q.  And what are those consequences?

15       A.  Jail.

16       Q.  Okay.  Have -- you have -- you've

17   sued Sirius in other matters, correct?

18       A.  I've sued Sirius in small claims,

19   yes.

20       Q.  All right.  And you've submitted

21   documents in connection with those cases,

22   correct?

23       A.  I did.

24       Q.  And in this lawsuit here, you are the

25   named plaintiff, correct?

1          THOMAS BUCHANAN - MAY 15, 2018

2          A.  So far, yes.

3          Q.  Right.  And you submitted documents

4     in this case as well, right?

5          A.  Yes.

6          Q.  And anything that you -- withdrawn.

7               You prepared for your deposition

8     today, right?

9          A.  Yes.

10         Q.  Tell us what you did, please.

11         A.  Reviewed my notes, reviewed my

12    documents.

13         Q.  Okay.  What notes are you referring

14    to?

15         A.  Documents that I provided my legal

16    team and that I'm sure has been provided to you.

17         Q.  Okay.  When you said a second ago you

18    reviewed your notes, reviewed your documents, is

19    there a difference between your notes and your

20    documents?

21         A.  Yes.

22         Q.  Okay.  So what do you mean by your

23    notes?

24         A.  The notes are basically the notes

25    that I've put together when I filed the small

```
 1              THOMAS BUCHANAN - MAY 15, 2018
 2    claims case outlining what occurred, the dates,
 3    the times of the phone calls, the -- the overall
 4    broad case that I presented to the Judge.
 5          Q.  Are those notes that you actually
 6    wound up filing in those cases?
 7          A.  Absolutely.
 8          Q.  Okay.  Did you review anything else?
 9          A.  No.
10          Q.  Did you -- did you meet with any
11    attorney?
12          A.  Other than my legal team, no.
13          Q.  Okay.  So who did you meet with to
14    prepare for your deposition?
15          A.  I met with my -- my attorney.
16          Q.  Who?
17          A.  Jarrett.
18          Q.  Okay.  Anyone else?
19          A.  No.
20          Q.  And how many times did you meet with
21    Jarrett to prepare?
22          A.  Well, we -- we met yesterday once to
23    outline basically what would happen, what a
24    deposition is.
25          Q.  And you don't have to tell me what --
```

1        THOMAS BUCHANAN - MAY 15, 2018

2        A.  Okay.

3        Q.  And, in fact, you shouldn't because

4    that's privileged.  Okay?

5        A.  Okay.

6            MR. ELLZEY:  Thank you.

7        Q.  And how long -- was it Mr. -- Jarrett

8    is Mr. Jarrett Ellzey?

9        A.  Yes.

10       Q.  Okay.  Was it just Mr. Ellzey?

11       A.  Yes.

12       Q.  And how long did you guys meet for?

13       A.  At least two hours.

14       Q.  Okay.  Anybody else there?

15       A.  My wife.

16       Q.  All right.  Anybody else?

17       A.  No.

18       Q.  Other than meeting for two hours, did

19   you talk with any other lawyers, either in person

20   or on the phone, to prepare for your deposition?

21       A.  No.

22       Q.  Okay.  And you looked at various

23   documents yesterday, correct?

24       A.  I did.

25       Q.  Did you see anything in any of the

1           THOMAS BUCHANAN - MAY 15, 2018

2    materials that you reviewed that led you to

3    believe maybe you had made a mistake in anything

4    you had submitted to any court?

5           A.  Absolutely not.

6           Q.  Okay.

7           MR. ARMSTRONG:  Kim, can you mark

8    this, please.

9           (Exhibit 1 was marked.)

10          Q.  Mr. Buchanan, you've been handed what

11   we've marked as Defendant's Exhibit 1, the first

12   page of which is titled "Petition Small Claims

13   Case, Plaintiff Thomas Buchanan, Defendant Sirius

14   XM Holdings."

15          Do you see that?

16          A.  I do.

17          Q.  Okay.  It's a multi-page document.

18   At the bottom it bears Bates numbers -- we call

19   those Bates numbers.

20          Do you see the lower right-hand

21   number?

22          A.  Yes.

23          Q.  It starts with XSM?

24          A.  Yes.

25          Q.  Okay.  It bears the Bates XSM 2237

1          THOMAS BUCHANAN - MAY 15, 2018

2     through 2245.  Okay.  This is a -- you recognize

3     this document, right?

4          A.  I do.

5          Q.  And it is material that you prepared,

6     correct?

7          A.  That's correct.

8          Q.  And you wrote it to a judge; is that

9     right?

10         A.  I did.

11         Q.  And what judge was that?

12         A.  I would have to look at my records to

13    determine the name of the judge.  I don't recall

14    off the top of my head.

15         Q.  What record would you look at to

16    determine that?

17         A.  Some additional paperwork that I have

18    in the file.

19         Q.  Okay.  When you say "in the file,"

20    what -- what do you mean, in the file?

21         A.  I have a file folder full of

22    documents.

23         Q.  And do you have -- at home, do you

24    have an office in your house?

25         A.  No.

1          THOMAS BUCHANAN - MAY 15, 2018

2          Q.  Okay.  Where do you keep this file

3     folder?

4          A.  I keep it in my bedroom.

5          Q.  All right.  Is it -- do you have a

6     expanded file folder that has other files or just

7     -- is it just this one file?

8          A.  No.  It's an expanded folder, a file

9     system.

10         Q.  You mean -- so -- so you keep other

11    things like bills, deeds, important papers?

12         A.  No.  It's only dedicated to this

13    particular issue.

14         Q.  And when you say "this issue," you

15    mean the dispute you have with Sirius?

16         A.  Yes.

17         Q.  All right.  When did you start

18    maintaining that file?

19         A.  When the phone calls started coming,

20    I started recording the dates and the times of

21    the phone calls.

22         Q.  Okay.  And then you would put that

23    material and your notes in the file?

24         A.  And I also have it on -- in

25    electronic version, yes.

1          THOMAS BUCHANAN - MAY 15, 2018

2          Q.  What's the electronic version?  Where

3     is that stored?

4          A.  On my laptop.

5          Q.  Okay.  And how is that stored?

6          A.  How is it stored?

7              MR. ELLZEY:  Objection.  Form.

8          A.  I don't understand the question.

9          Q.  Okay.  Do you have a file

10    specifically dedicated to the Sirius XM dispute

11    on your laptop?

12         A.  I have a file folder, electronic file

13    folder, yes, to group the documents together,

14    yes.

15         Q.  Is that one folder, Mr. Buchanan?

16         A.  No, it's multiple folders.

17         Q.  And do you have a main folder?

18         A.  Yes.

19         Q.  And what's the title of that main

20    folder on your computer?

21         A.  Probably something like "Sirius XM

22    Lawsuit."

23         Q.  All right.  And in connection with --

24    before you came here today, did you search all of

25    your electronic file folders?

1          THOMAS BUCHANAN - MAY 15, 2018

2          A.  No.

3          Q.  Okay.  Did you search the paper file

4    folder that you maintained?

5          A.  I reviewed some of the documents in

6    the paper file folder, yes --

7          Q.  How --

8          A.  -- to refresh my memory.

9          Q.  How did you select what documents to

10   review in the paper file folder?

11         A.  Just based on the type of document.

12         Q.  Can you tell me what that means?

13         A.  No, other than the fact that I looked

14   at the document and determined did I need to

15   refresh my memory or not.  And if I thought I

16   did, I re-read the document.

17         Q.  Okay.  Tell me the things that you

18   thought you needed to refresh your memory on.

19         A.  The dates, the times of the phone

20   calls, the -- you know, basically what you have

21   presented before me.

22         Q.  Anything else?

23         A.  No.

24         Q.  Okay.  Did you -- so then you didn't

25   turn that -- the contents of that paper file, all

THOMAS BUCHANAN - MAY 15, 2018

1  of them, over to your lawyer, right?

2      A.  I believe my legal teams have copies

3  of everything that I have, electronic, paper, or

4  anything else.  And if they -- if they don't, it

5  was purely an omission on my part, an accidental

6  omission.  But I believe I provided everything.

7      Q.  How did you provide it to them?

8      A.  I mailed it.

9      Q.  Okay.  So -- but a second ago, you

10 told me that you did not go back and review your

11 electronic folders.  Remember that?

12     A.  I did not review every single

13 document electronically that I have.

14     Q.  So you do have --

15     A.  That's correct.

16     Q.  -- documents that relate to this

17 dispute that you did not review and turn over to

18 your lawyers.  Fair?

19     A.  I don't have --

20         MR. ELLZEY:  Objection.  Form.

21     A.  I don't -- I don't have documents.  I

22 did not review all of the electronic documents.

23 It is incorrect for you to say that I failed,

24 neglected to turn them over to my attorney.

1          THOMAS BUCHANAN - MAY 15, 2018

2    Again, as far as I know, my attorney has copies,

3    either electronic -- in electronic form or on

4    paper form of every single document that I have.

5          Q.  Let's break this down, Mr. Buchanan.

6              When I asked you how you sent these

7    documents to your lawyer, you said you mailed

8    them to him.  Right?

9          A.  That's correct.

10         Q.  How many mailings were there?

11         A.  There were several.

12         Q.  All right.  And this is -- when you

13   say "mail," you mean you used the U.S. Mail?

14         A.  I did.

15         Q.  All right.  Did you ever send any

16   documents to your attorney electronically?

17         A.  I could have emailed him electronic

18   documents as attachments.  I don't recall.

19         Q.  Just --

20         A.  So I -- I don't -- I don't know the

21   answer to that.  I -- I might have.  We've had so

22   many communications back and forth that if he

23   asked for something and I had it in electronic

24   form, I'm sure I sent it to him as an attachment.

25         Q.  It's just what you remember or what

1          THOMAS BUCHANAN - MAY 15, 2018

2   you know, not what you might have done.  Okay?

3          A.  That's correct.  Okay.

4          Q.  Okay.  So in terms of those

5   electronic files, you sitting here can't tell me

6   what you actually emailed to your counsel; is

7   that fair?

8          A.  I think that's fair, yeah.

9          Q.  All right.

10          A.  But I did make every effort to

11   provide every document, all of the information to

12   my legal team.  I wanted them to have a copy of

13   everything that I have.

14          Q.  Right.  But you did not go in and

15   print out all of your documents from your

16   electronic folders and send them to counsel,

17   correct?

18          A.  I don't recall if I did or not.

19          Q.  Okay.  If we look at this document,

20   this has been marked as Defendant's Exhibit 1.

21          A.  Okay.

22          Q.  Do you see on -- there's a grid of

23   calls and time of call and numbers --

24          A.  Yes.

25          Q.  -- called from.

1    THOMAS BUCHANAN - MAY 15, 2018

2            Do you see that?

3    A.   Yes.

4    Q.   Okay.  And you prepared this entire

5    document, including this grid, right?

6    A.   I did.

7    Q.   All right.  Below the grid, you say,

8    "Finally on July 29th, 2016, I called the phone

9    number that had been calling and was told that it

10   was Sirius XM Radio."

11           Do you see that?

12   A.   Yeah.

13   Q.   Did you write that?

14   A.   I did.

15   Q.   Was that true?

16   A.   Yes.

17   Q.   So you were advising the judge that

18   you found out on July 29th that Sirius XM Radio

19   had been calling you?

20   A.   Yes.

21   Q.   So that's the first time -- is it

22   fair to say that's the first time you learned the

23   identity of the caller?

24   A.   I think that's fair to say that.

25   Yes.

THOMAS BUCHANAN - MAY 15, 2018

1

2       Q.   Okay.   Thank you.

3            MR. ARMSTRONG:   Okay.   Kim, can you

4    mark this as Defendant's 2, please?

5            (Exhibit 2 was marked.)

6       Q.   Okay.   We've marked -- we've marked

7    as Defendant's Exhibit 2 a letter on Thomas F.

8    Buchanan's letterhead dated July 24th, 2016, to

9    Sirius XM Holdings.

10           You've seen this letter before, sir?

11      A.   I have.

12      Q.   That's your signature?

13      A.   Yes.

14      Q.   Okay.   What's the date of the letter?

15      A.   July 24th.

16      Q.   Now, you'll agree with me that

17   July 24th is before July 29th, correct?

18      A.   I will agree with that, yes.

19      Q.   Okay.   So please explain to us then,

20   if you first learned that Sirius was calling you

21   on July 29th, how it is you sent a letter to

22   Sirius on July 24th.

23      A.   Well, the explanation is pretty easy.

24   The list of phone calls that I have listed on

25   page 1 of Exhibit 1 is not an inclusive list of

1          THOMAS BUCHANAN - MAY 15, 2018

2   every phone call that I received from that

3   number.  That's just when I started recording the

4   phone calls.  There were actually many more than

5   these 16, 15 phone calls, but, you know, those

6   are the ones that I was able to document and

7   started documenting as of August the 4th.

8          Q.  But, Mr. Buchanan, it could have been

9   a thousand phone calls.  I'm just asking you in

10  light of your testimony that you learned for the

11  first time that it was Sirius that was calling

12  you on July 29th, how is it that you wrote a

13  letter on July 24th to Sirius?

14          A.  I guess I don't understand the

15  question.

16          Q.  You never sent that letter to Sirius,

17  did you?

18          A.  Oh --

19          MR. ELLZEY:  Objection.  Form.

20          A.  -- absolutely I did.  As a matter of

21  fact, I mailed the letter on July 24th.

22          Q.  What day of the week was that?

23          A.  I don't know.  I can look it up.

24          Q.  Do you know -- what's your address,

25  please?

1      THOMAS BUCHANAN - MAY 15, 2018

2      A.  508 Oldbridge Drive, Allen, Texas.

3      Q.  And where do you go -- where did you

4  go in July 2016 to mail items?

5      A.  I go to the post office.

6      Q.  Where?  Which post office do you --

7      A.  I -- I generally use the Allen,

8  Texas, post office.

9      Q.  Is that open on a Sunday?

10      A.  I don't believe so, no.

11      Q.  Then how is it that you mailed this

12  because July 24th is a Sunday?

13      A.  Well, I either did one of two things.

14  The Allen post office has a drop box in front of

15  the post office.  I either dropped it in the

16  mailbox outside or the Allen post office -- even

17  though it's a Sunday, it leaves their doors open

18  so that residents can go in and drop the letters

19  inside through a slot.

20      Q.  Okay.  It's your -- on Defendant's

21  Exhibit 2, that's your handwriting in the upper

22  right-hand corner, correct?

23      A.  Yes.

24      Q.  And, now, you wrote another letter to

25  Sirius that we will look at in a few moments, and

1          THOMAS BUCHANAN - MAY 15, 2018

2     that was requesting -- actually, withdrawn.

3          You wrote another letter to Sirius

4     requesting its do-not-call policy, correct?

5          A.  That's correct.

6          Q.  And you sent that by certified mail,

7     return receipt requested?

8          A.  If that's what I've put on the

9     document or -- then, yes.

10         Q.  Well, it's one of the documents you

11    reviewed yesterday, isn't it?

12         A.  It might have been.  I don't recall.

13         Q.  Only what you can recall.

14         A.  Okay.

15         Q.  Okay.  But you didn't send this --

16    Defendant's Exhibit 2, you didn't send this by

17    certified mail, correct?

18         A.  Based on my notation, no, it went

19    just first class, regular U.S. Mail.

20         Q.  Why did you send one certified and

21    the other not certified?

22         A.  Because the one I was requesting

23    information from the company, and I wanted to be

24    able to prove that I actually sent it -- sent --

25    sent the request to Sirius.

1          THOMAS BUCHANAN - MAY 15, 2018

2          Q.  Okay.

3          A.  And this letter before me dated

4     July 24th, I naively at that point assumed that

5     if you contact a company that's calling you two

6     and three times a week and you ask politely for

7     them to stop, that they'll -- they'll stop, and

8     you inform them that I'm on the do-not-call list,

9     I don't wish to receive phone calls from you,

10    that they'll agree to that request and -- and

11    cease.

12         Q.  In -- let's mark another exhibit,

13    please.

14              MR. ARMSTRONG:  Here you go, Kim.

15              (Exhibit 3 was marked.)

16         A.  Not every document that I mail do I

17    send certified.  But I can tell you subsequent to

18    these documents and these letters and other cases

19    and in other situations, yes, everything that I

20    -- I send out, I send out certified so that I can

21    prove the company actually received it.

22         Q.  So at least with -- we'd agree then,

23    at least with Exhibit 2, you can't prove that the

24    company received it, correct?  Is that fair?

25         A.  That's a fair statement.

Page 26

1          THOMAS BUCHANAN - MAY 15, 2018

2          Q.   Okay.  If you'll look at what we've

3    marked as Defendant's Exhibit 3 that's in front

4    of you.  That's your complaint in this action.

5              And you've seen this before, correct?

6          A.   I have.

7          Q.   Okay.  And in your complaint at

8    paragraph 23, if you would turn with me, you

9    discuss there internal do-not-call registries.

10   And you reference a period of 30 days.  Would you

11   read that paragraph to yourself, and I'll have a

12   question.

13             (Witness reviewing document.)

14         A.   Okay.  I've read it.

15         Q.   Okay.  So what do you mean

16   "reasonable time not to exceed 30 days"?

17             MR. ELLZEY:  Objection.  Form.

18         Q.   You can answer.

19             MR. ELLZEY:  Yeah, just real quick.

20   From time to time, I'll be objecting --

21             THE WITNESS:  Okay.

22             MR. ELLZEY:  -- to some of the

23   questions.  You can still answer the question,

24   unless I instruct you not to.

25             THE WITNESS:  Okay.

1      THOMAS BUCHANAN - MAY 15, 2018

2          MR. ELLZEY:  All right.

3      A.  So the question is what does it

4  mean --

5      Q.  In your --

6      A.  -- the 30-day period to me?  It means

7  that a corporation has 30 days to comply with a

8  request, and if I make the request to stop

9  calling me, they have up to 30 days to get that

10  programmed into whatever system or whatever call

11  center that they use so that those phone calls

12  will cease.  I don't expect or I don't think

13  anyone would expect those phone calls to cease

14  overnight, and so they -- they are given a window

15  of time.

16      Q.  So if we turn to page 7 of your

17  complaint.  It's paragraph 34.

18      A.  Okay.

19      Q.  There's a list of the calls that

20  looks similar to the list we saw in Defendant's

21  Exhibit 1.

22      A.  Okay.

23      Q.  Okay.  And you prepared this,

24  correct?

25          MR. ELLZEY:  Objection.  Form.

1      THOMAS BUCHANAN - MAY 15, 2018

2          Q.  Did you prepare this list?

3          A.  I did.

4          Q.  Okay.  And when do you claim you

5      transmitted your request to be placed on Sirius

6      XM's internal do-not-call list?

7          A.  I did so based on the July 24th

8      letter.

9          Q.  Even if you did so based on the

10     July 24th letter, can't we agree that according

11     to your list of calls, Sirius XM indeed did stop

12     calling you within 30 days?

13         A.  Oh, I'd completely disagree.

14         Q.  Okay.  Can you tell me based on the

15     calls that you've pled here, which call falls

16     outside of the 30-day reasonable time period?

17         A.  And as I stated before, I received

18     other calls that I did not document and -- on

19     this call list that is -- that were well outside

20     of the 30-day time period.

21         Q.  How --

22         A.  And -- and I -- I made the mistake of

23     not recording those, and that's clearly a mistake

24     that I made.  I don't -- I don't record -- I

25     don't document every single phone call that I

1       THOMAS BUCHANAN - MAY 15, 2018

2  received, or I did not during that time period.

3       Q.  Well, you requested records from your

4  carrier, didn't you?

5       A.  I did.

6       Q.  And your carrier was AT&T?

7       A.  That is correct.

8       Q.  And you reviewed -- because you

9  brought a federal case, you reviewed those

10  records carefully, right?

11       A.  Yes.

12       Q.  And from those records, that helped

13  you provide the list that you represented to the

14  Court, right?

15       A.  Absolutely not.

16       Q.  Okay.  They didn't help you at all?

17       A.  It did not help me document --

18  prepare this list.  This list came from a

19  spreadsheet that I have in my possession of most,

20  not all, but most of the calls that I received.

21       Q.  Okay.  So when you write in

22  paragraph 34 that a "total of 16 telemarketing

23  calls were received," that's actually incorrect?

24       A.  That's incorrect only from the

25  standpoint of I only documented on my spreadsheet

1          THOMAS BUCHANAN - MAY 15, 2018

2     16 of those calls.  I, however, received many

3     more calls than those 16.

4          Q.  But you didn't represent to this

5     federal court that you have documented more

6     calls; you represented that the total was 16

7     telemarketing calls?

8          A.  I only documented 16 of those phone

9     calls.

10         Q.  Tell me where in here you say

11    "documented."  Where do you use that word?

12         A.  I don't.

13         Q.  Okay.  So although you wrote "a total

14    of 16 calls," you now claim there were more than

15    16 calls.  True?

16         A.  I don't now claim it.  I've claimed

17    it from day one when I filed the small claims

18    case.

19         Q.  Well, let's look back at Exhibit 1 --

20    Defendant's Exhibit 1 when you wrote to this

21    Judge, right?

22         A.  Yes.

23         Q.  Okay.  How many calls did you log

24    there for the Judge?

25         A.  Sixteen.

1    THOMAS BUCHANAN - MAY 15, 2018

2         Q.  Okay.  So you're saying that again

3    when you wrote to this Judge, a different Judge,

4    you, again, did not accurately reflect all of the

5    calls?

6         A.  And the only reason why I did not

7    include the other phone calls that I received --

8         Q.  Yes, sir.

9         A.  -- was I did not document those calls

10   on my spreadsheet.  Had I documented the other 5

11   or 10 or 20 or whatever the amount of calls were

12   and I could go to my spreadsheet and say on this

13   date at this time, this number called me, then it

14   would be on this list.  Okay.

15        Q.  Well, how many were there?  Were

16   there 5?  Or were there 20?  Or were there 40?

17        A.  As I recall there were a considerable

18   number of phone calls.

19        Q.  Okay.  But you said to me a second

20   ago -- you told -- you testified that you did, in

21   fact, tell the courts in connection with these

22   other cases that there were additional calls.

23             Do you remember saying that?

24             MR. ELLZEY:  Objection.  Form.

25        Q.  Yes?

1          THOMAS BUCHANAN - MAY 15, 2018

2          A.  Yes.

3          Q.  Okay.  So show me where on this

4  document -- and I have others that you've

5  submitted to the Court -- I haven't seen anything

6  other than this list of numbers.

7                MR. ELLZEY:  Objection.  Form.

8          Q.  Is there perhaps a document in one of

9  your files that you haven't produced?

10          A.  No.  Again, I stand by my comment of

11  I did not document in my spreadsheet the other

12  phone calls; otherwise, they would have been

13  listed on here.

14          Q.  Have you ever alleged in a court

15  document anything more than the calls that you've

16  included here on Defendant's Exhibit 1?

17          A.  Absolutely.

18          Q.  Okay.  Which -- which -- which case

19  was that?

20          A.  In small claims.

21          Q.  Okay.  Have you produced to your

22  attorney all the documents you have related to

23  your small -- small claims cases?

24          A.  To my knowledge, again, my legal

25  teams have all of the documents that I have.

THOMAS BUCHANAN - MAY 15, 2018

1

2      Q.  Okay.  There's actually a discrepancy

3  between these two lists, that is, the one that's

4  in the complaint and the one that's in

5  Defendant's Exhibit 1.  One contains 15 calls;

6  another contains 16 calls.

7          Do you know why there's a

8  discrepancy?

9      A.  I do not.

10      Q.  Okay.

11      A.  Three, two -- there appears to be a

12  discrepancy in the last entry.  One is 7/18 and

13  one is 7/19.  They could have been a typo for all

14  I know.

15      Q.  Well, there's also -- on -- in the

16  complaint, paragraph 34, there's a reference to a

17  call on August 2, 2016, at 10:43 a.m. that I

18  don't see on Defendant's Exhibit 1?

19      A.  That's correct.

20      Q.  Okay.  So according to -- if you look

21  at the complaint, paragraph 29, you write, "On

22  May 2, 2016, plaintiff purchased a 2011 Honda

23  Odyssey."

24          Do you see that?

25      A.  What number?

1          THOMAS BUCHANAN - MAY 15, 2018

2          Q.  It's paragraph 29 --

3          A.  29.

4          Q.  -- of the complaint.

5          A.  Okay.  Yes.

6          Q.  Is that true?

7          A.  Yes.

8          Q.  Okay.  And then you have calls that

9     we looked at on paragraph 34, right?

10          A.  That's correct.

11          Q.  Okay.  So after purchasing the

12    vehicle on May 2nd, you received the calls that

13    we reviewed in connection with that purchase; is

14    that fair?

15          A.  Yes.

16          Q.  And then at some point, you say that

17    you wrote a letter requesting that you be placed

18    on the internal do-not-call list, right?

19          A.  Yes, that's correct.

20          Q.  Okay.  So did you get calls from any

21    other company in connection with your purchase of

22    the Odyssey?

23          A.  No.

24          Q.  So only Sirius called you in

25    connection with your purchase of the Odyssey?

1            THOMAS BUCHANAN - MAY 15, 2018

2         A.  That's correct.

3         Q.  And did you ever speak with Bob

4    Tedford -- anyone at Bob Tedford after you

5    purchased the Odyssey?

6         A.  Regarding?

7         Q.  Regarding anything.

8            MR. ELLZEY:  On the phone?  I'm

9    sorry, Counsel.

10        Q.  (BY MR. ARMSTRONG) We -- we can start

11   with that.  On the phone?

12        A.  No, not to my knowledge.

13        Q.  Okay.  How about in person?  This is

14   after you purchased the Odyssey.

15        A.  I might have had a conversation with

16   them.  I -- I don't recall.

17        Q.  If we go back to Defendant's

18   Exhibit 1, please.

19            (Witness complies.)

20        Q.  You prepared this on August --

21   withdrawn.

22            You submitted this on August 8, 2016,

23   right?

24        A.  That's correct.

25        Q.  And in writing to this Judge, were

1          THOMAS BUCHANAN - MAY 15, 2018

2    you trying to be as thorough and correct as you

3    could be?

4          A.  I was.

5          Q.  Okay.  You don't reference in here,

6    though, the July 24th letter that we've marked as

7    Defendant's Exhibit 3 -- I'm sorry -- Defendant's

8    Exhibit 2?

9          A.  And your -- is there a question there

10   or --

11         Q.  I just -- in trying to be as thorough

12   as you can, is there any reason why you didn't

13   include the letter you claim to have sent to

14   Sirius on July 24th of 2016?

15         A.  I have very little legal experience.

16   I could have accidentally omitted it.  I could

17   have thought I included it and didn't.  I can

18   think of a number of reasons.

19         Q.  Just whatever you can recall.

20         A.  So that's my response.

21         Q.  Got it.  You also told the Judge that

22   it would appear that Sirius XM purchased the DMV

23   list from the State?

24         A.  At that point -- at that time that's

25   what I assumed had happened is they bought some

1            THOMAS BUCHANAN - MAY 15, 2018

2      DMV list.

3            Q.  Were you right about that?

4            A.  I was incorrect --

5            Q.  Okay.  Where did --

6            A.  -- I have subsequently learned.

7            Q.  How did you learn that?

8            A.  Through --

9            MR. ELLZEY:  Objection.  Form.

10           Don't answer it if that information

11     came from your attorneys.

12           Q.  Did you learn it on -- that -- all

13     right.  I'll leave it.

14           At the time you told the Judge that,

15     "This is another case where a company purchased a

16     list from DMV," what proof did you have that that

17     was the truth?

18           A.  I had no proof.  It was just around

19     the time that I purchased the vehicle, and the --

20     the subsequent mailings that I started to receive

21     were styled in the same way of -- that I had the

22     title put in my wife's name.  And so I -- I -- I

23     assumed that someone just bought a list.

24           Q.  When you say the subsequent mailings

25     you started to receive, can you explain to me

1              THOMAS BUCHANAN - MAY 15, 2018

2    what you're talking about, Mr. Buchanan?

3         A.  That I received -- that we started

4    receiving from Sirius offering us a free 30-day

5    or ever what the -- the time period was trial to

6    try their satellite radio.

7         Q.  Are these paper mailings?

8         A.  Yes.

9         Q.  How many?

10        A.  Several.

11        Q.  And this is before you ever received

12   the first call from Sirius XM, correct?

13        A.  No, that's incorrect.

14        Q.  All of them were after you received

15   the first call?

16        A.  Yes.  To my knowledge, that's

17   correct.

18        Q.  Well, let's just look at your

19   complaint.  Okay?

20        A.  Okay.

21        Q.  You did review your complaint --

22        A.  Yes.

23        Q.  -- in connect -- just, again, for Kim

24   we need to make sure we wait for each other.

25             You did review your complaint to

1          THOMAS BUCHANAN - MAY 15, 2018

2    prepare for this deposition, right?

3          A.  I did.

4          Q.  Okay.  So let's look at it together,

5    please.  And that's Exhibit 3?

6               MS. WAKS:  Yes.

7          Q.  Okay.  Do you see that in

8    paragraph 32, you advise the Court in this

9    federal court filing that "approximately a month

10   after the Odyssey purchase, a welcome kit from

11   defendant was delivered to plaintiff's

12   residence"?

13              Do you see that?

14         A.  Yes.

15         Q.  Was that a true statement?

16         A.  To the best of my knowledge, yes,

17   that's a true statement.

18         Q.  Okay.  And you purchased it,

19   according to you, on May 2nd, right?

20         A.  I would have to check the exact date.

21         Q.  Well, sir, you've put it in a federal

22   court filing.

23         A.  If that's what it says, then I assume

24   it's correct.

25         Q.  Okay.  Well, I -- I wouldn't -- it's

1        THOMAS BUCHANAN - MAY 15, 2018

2    your complaint.

3        A.  Okay.  Well, I'm just saying I -- I

4    don't recall the exact date of the purchase.  If

5    it's a big deal, I'll be glad to check and see

6    the exact date.

7        Q.  Okay.  It is a big deal that we get

8    things right.

9        A.  Okay.  Well --

10       Q.  -- so I want to make sure that --

11       A.  -- I'm trying to get things right.

12       Q.  I appreciate that.

13       A.  Okay.

14       Q.  Please let me finish my statement or

15   my question, okay, before you start so that we

16   don't talk over each other, okay.  Is that all

17   right?

18       A.  That's fine.

19       Q.  Okay.  So if you're correct in your

20   pleading, about a month after May 2nd, you

21   received a welcome kit from Sirius XM?

22       A.  That's correct.

23       Q.  So that's sometime in June, right?

24       A.  That's correct.

25       Q.  And you would agree with me that

THOMAS BUCHANAN - MAY 15, 2018

1

2  according to your calls that you plead in this

3  complaint, they don't begin until a time after

4  that, right?

5          A.  The ones that I documented begin

6  July 18th.

7          Q.  Right.  So tell me the first time

8  that you received a call from anyone on behalf of

9  Sirius XM in connection with your purchase of the

10 Odyssey.

11         A.  I can't do that.  I -- as I said, I

12 did not document every call.

13         Q.  Okay.  You also received emails from

14 Sirius XM, correct?

15         A.  I received one email from Sirius XM.

16         Q.  Just one?

17         A.  To my knowledge, yes.

18         Q.  When was that?

19         A.  Again, I would have to look at the

20 email to see the date.

21         Q.  You opened that email, right?

22         A.  I did, yes.

23         Q.  Okay.  And you clicked on a link,

24 correct?

25         A.  I did not.

1          THOMAS BUCHANAN - MAY 15, 2018

2          Q.  What did the email say?

3          A.  I -- I would have to look at the

4     document.

5          Q.  Do you have -- well, did you look at

6     it in connection with preparing for your

7     deposition?

8          A.  I -- no, I don't recall reviewing

9     that.

10         Q.  You still have it, though, right?

11         A.  I'm sure I do.

12         Q.  Okay.  That's in that file you

13    mentioned?

14         A.  Yes.

15         Q.  Exhibit 2, please.  That was the

16    July 24th letter.

17         A.  Okay.

18         Q.  What did you prepare this letter on?

19    Was it a computer?

20         A.  Yes.

21         Q.  Which computer?

22         A.  My laptop computer.

23         Q.  You've mentioned a laptop before.  Is

24    that the same laptop we've been talking about?

25         A.  Yes.

Page 43

1          THOMAS BUCHANAN - MAY 15, 2018

2          Q.  Okay.  What kind of laptop is it?

3          A.  It was a -- at that time a Toshiba.

4          Q.  Don't have it anymore?

5          A.  I basically have transferred the

6     files over to a different one.

7          Q.  Where is the actual hardware, the

8     Toshiba?

9          A.  It's at my home.

10         Q.  Okay.  And what did you tran -- when

11    did you make these transfer of files?

12         A.  Several months ago.

13         Q.  Okay.  So whatever was on the Toshiba

14    is now on your new computer?

15         A.  Yes.

16         Q.  Okay.  What kind of computer is that?

17         A.  It's a generic-type computer.

18         Q.  No brand name?

19         A.  It's -- it's got some third party --

20    it's -- I don't recall.

21         Q.  Okay.  Do you own a home?

22         A.  I do.

23         Q.  And how do you get your mail?  Is

24    there a mailbox?

25         A.  Yes.

1    THOMAS BUCHANAN - MAY 15, 2018

2    Q.  And are you -- you specifically -- or

3   does your wife -- who actually goes out to gather

4   the mail?

5    A.  It varies, depending on the date.

6    Q.  Is --

7    A.  Generally my wife does.

8    Q.  Okay.  And then is there a place when

9   she or you bring it into the house where you guys

10  keep the mail?

11   A.  No.  We just set it on the counter in

12  the kitchen.

13   Q.  That's where I do it is --

14   A.  I mean --

15   Q.  -- on the kitchen counter.  Okay.

16   A.  I mean, we don't have a designated

17  mail place, so...

18   Q.  All right.  So but typically you put

19  it on the kitchen counter?

20   A.  Sure.

21   Q.  And then is there a process by which

22  you go through and decide what to keep and what

23  to discard?

24   A.  Yes.

25   Q.  All right.  And so do you -- like I,

1          THOMAS BUCHANAN - MAY 15, 2018

2    if there's junk mail, I toss it.

3         A.  Uh-huh.

4         Q.  Okay.  And how do you define "junk

5    mail"?

6         A.  How do I define junk mail?

7         Q.  Well, let me ask -- let me ask it a

8    different way.  Okay.

9              Is it fair to say if you -- if you

10   have a relationship with a company or a person,

11   you retain the mail and read it?

12             MR. ELLZEY:  Objection.  Form.

13        A.  Yes.

14        Q.  And if you don't, then you discard

15   it?

16        A.  Except in the case of Sirius XM, when

17   I found out who was calling us, I instructed my

18   wife should we ever receive anything from Sirius

19   XM, it's to be given to me.

20        Q.  And why is that?

21        A.  Because I'm going after these

22   companies that are calling in violation of the

23   do-not-call list.

24        Q.  Okay.

25        A.  And I -- I want to keep in a file

1          THOMAS BUCHANAN - MAY 15, 2018

2    folder or I'm trying to keep in a file folder

3    every correspondence that I receive.

4          Q.  When you say "these companies," which

5    companies are you referring to?

6          A.  Right now it's Sirius XM.

7          Q.  Any other?

8          A.  Not at the moment, no.

9          Q.  Have you ever sued another company

10   for violations of the do not call?

11         A.  Oh, absolutely.

12         Q.  Okay.  How many?

13         A.  Several.

14         Q.  Which ones?

15         A.  There was a window and door company.

16   There was just a door company that kept calling.

17   Those are the two that come to mind.

18         Q.  Okay.  What was the name of the

19   window and door company?

20         A.  I would have to look at my notes.

21         Q.  What notes would you be looking at?

22         A.  The ones that I have at home.

23         Q.  And how about the door company?

24   What's the name of that one?

25         A.  Same thing.  I'd have to --

1         THOMAS BUCHANAN - MAY 15, 2018

2         Q.  When -- when were these lawsuits?

3         A.  Within the past 24 months.

4         Q.  Okay.  And --

5         A.  Not -- not all of these went to

6    court, though, so...

7         Q.  Well, tell me what happened in each

8    of the -- the one against the window and door

9    company.  Did you file a complaint?

10        A.  In the window and door company, I

11   filed the complaint.  I went to the local police

12   department, much like I did in the case of

13   Sirius, and had them find out who was calling,

14   the reason for the call, and went ahead and

15   submitted pretty much a summary to the Judge, as

16   I did in the Sirius case.

17            And the Judge -- and I'm assuming

18   this is what happened -- the staff, I assume,

19   contacted the company that was being sued and

20   said you need to call Mr. Buchanan and offer him

21   an out-of-court settlement because you're clearly

22   in violation, which they did, and made a offer,

23   and I accepted it.

24        Q.  And how much was the offer?

25        A.  Much -- much like what I did with

THOMAS BUCHANAN - MAY 15, 2018

1    Sirius XM.  Your -- your attorney -- your legal

2    team contacted me and said would you be willing

3    to settle out of court?

4           Q.  Okay.  Are you finished?

5           A.  Yes.

6           Q.  How much did you settle that other

7    case for?

8           A.  I believe it was 3,500.

9           Q.  And how about the -- so that's the

10   window and door company, whatever its name is.

11          How about the door company case?

12   What happened to that?

13          A.  It never went to trial.

14          Q.  Right.  Well, this other case didn't

15   go to trial either.  So how did it resolve, if it

16   did?

17          A.  It was dropped.

18          Q.  Did you get any payment?

19          A.  I did not.

20          Q.  And why did you drop it?

21          A.  I -- I don't recall off the top of my

22   head.  There was some dispute as to some issue

23   that I raised, and so I -- I dropped it.

24          Q.  Okay.  So back to the -- the mail.

1      THOMAS BUCHANAN - MAY 15, 2018

2    So you -- when it comes to sorting the mail,

3    paying the bills, is that typically your

4    responsibility or Mrs. Buchanan's?

5         A.  Mrs. Buchanan's.

6         Q.  Okay.  And do you -- is it customary

7    for you to discard mail just based on what's the

8    -- what's on the front cover of it?

9         A.  No.  Generally we open --

10        Q.  Okay.

11        A.  -- in general everything that we

12   receive and look at it.

13        Q.  Okay.  By "look at it," you actually

14   will read it?

15        A.  We don't read every word of it.  We

16   look at it to determine is it AT&T selling a

17   bundle or Verizon or -- or is it an important

18   document or is it just something that should be

19   discarded.

20        Q.  And when you say "we," that's

21   essentially the way the Buchanans do it?  That's

22   you and Mrs. Buchanan?

23        A.  Yes.

24        Q.  All right.  Now, you did receive a

25   welcome kit from Sirius XM, correct?

1    THOMAS BUCHANAN - MAY 15, 2018

2    A.  Yes.

3    Q.  That's what you've pled in your case,

4    right?

5    A.  If you call a -- a letter a -- a

6    welcome kit.  Generally when I think of a wel --

7    welcome kit, it's a kit of items.  This was just

8    a welcome letter pretty much.

9    Q.  Well, when you say gift, it would

10   include items, what -- what do you -- what kind

11   of items?

12   A.  It depends on what they're trying to

13   sell.

14   Q.  Okay.  Well, you -- you -- although

15   you didn't plead welcome kit, you did in

16   paragraph 32 of your complaint say that you

17   received a welcome package?

18   A.  Yes.

19   Q.  Okay.  And you say that included in

20   there was a free trial offer, correct?

21   A.  Yes.

22   Q.  All right.  So do you remember

23   actually seeing the welcome package that you're

24   referring to here?

25   A.  Yes.

1    THOMAS BUCHANAN - MAY 15, 2018

2    Q.  What did it look like?

3    A.  What did it look like?  It was just a

4    welcome offer for a set period of time to receive

5    free satellite radio.

6    Q.  Okay.  And then when -- and at the

7    time -- at the time you received this, you had

8    not received any of the calls that you've pled in

9    this complaint?

10    MR. ELLZEY:  Objection.  Form.

11    A.  I'm confused as to the question.

12    Q.  You testified before that you

13    received the welcome package sometime in

14    June 2016, right?

15    A.  Okay.

16    Q.  Right?

17    A.  Yes.

18    Q.  All right.  And then we see from

19    paragraph 34 that the first of your documented

20    calls is July 19, 2016, correct?

21    A.  That's correct.

22    Q.  So at least according to your list of

23    calls that you've shared with the Court, that's

24    after you received the welcome package?

25    A.  That's correct.

1        THOMAS BUCHANAN - MAY 15, 2018

2        Q.   All right.  Why did you save the

3   welcome package?

4        A.   Because at that point, I wanted to

5   start saving -- or try to start save -- saving

6   everything that we received.

7        Q.   Because you believe you had received

8   phone calls prior to receiving the welcome

9   package?

10       A.   I can't prove it, but, yes.

11       Q.   By the way, the calls that we see

12  that you have pled on paragraph 34 --

13       A.   Yes.

14       Q.   -- you never answered any of those,

15  right?

16       A.   I attempted to.  I'm an acute

17  diabetic.  I was told to go home and rest.  I was

18  sleeping or attempting to sleep 20 hours a day in

19  my battle against the diabetes.  So what would

20  happen is Sirius XM or a call center that they --

21  that made the calls would call my home.  I would

22  have to get out of bed, walk across the house,

23  get to the phone, pick it up, and they would hang

24  up.

25       Q.   And then how did you know --

1          THOMAS BUCHANAN - MAY 15, 2018

2          A.  So, no, I never actually spoke to

3   anyone, and they never actually left a message on

4   my machine saying we'd like to offer you a free

5   trial.

6          Q.  Then how did you know it was coming

7   from Sirius or a company that employed --

8          A.  Based on --

9          Q.  -- that Sirius employed?  I'm sorry.

10         A.  Based on the Allen Police Department

11  and based on the phone call that I made to the

12  number that was calling me, they identified

13  themselves as Sirius XM.

14         Q.  Now, you're aware Sirius XM can tell

15  whether consumers actually listen to Sirius XM.

16  Is that something you know or you don't know?

17            MR. ELLZEY:  Objection.  Form.

18         A.  That's something I'm not aware of.

19         Q.  Okay.  When you purchased the car --

20  car on May 2, 2016, who was there that day?  You

21  and your wife?

22         A.  No, just myself.

23         Q.  Okay.  And you dealt with somebody

24  from Bob Tedford?

25         A.  Yes.

Page 54

1        THOMAS BUCHANAN - MAY 15, 2018

2        Q.  Did you deal with one person or more

3    than one person?

4        A.  More than one person.

5        Q.  Do you remember any of their names?

6        A.  No, not off the top of my head.

7        Q.  Do you remember them talking to you

8    about anything having to do with Sirius XM?

9        A.  No.

10       Q.  Do you remember seeing any literature

11   in the dealership concerning Sirius XM?

12       A.  No.

13       Q.  And is it fair to say you do recall

14   seeing an XM button on the dashboard?

15       A.  On the dashboard, yes, that's

16   correct.

17       Q.  Okay.  And after purchasing the

18   vehicle, you did push that button, correct?

19       A.  I did.

20       Q.  All right.  And you listened to the

21   music.  Fair?

22       A.  No, absolutely incorrect.

23       Q.  Okay.  What did you do after you

24   pushed the button?

25       A.  The button is not configured.  It's

1        THOMAS BUCHANAN - MAY 15, 2018

2    not operational in the van.  It -- it has never

3    been.  It's not operational as of this moment.

4        Q.  Okay.  You still have that truck?

5        A.  It's a van.  And, yes, I -- I -- I

6    have a van.

7        Q.  Okay.  I'm sorry.  I'll call it a

8    van.  You still have that van?

9        A.  Yes.

10        Q.  The one you purchased from Bob

11    Tedford?

12        A.  Yes.

13        Q.  Okay.  When did you push that XM

14    button?

15            MR. ELLZEY:  Objection.  Form.

16        A.  I don't recall.

17        Q.  Well, you bought it on May 2nd,

18    correct?

19        A.  Uh-huh.

20        Q.  And did you push it within days of

21    the purchase?

22        A.  And, again, my response is I don't

23    recall.

24        Q.  I'm just trying to see if you have

25    any recollection?

1          THOMAS BUCHANAN - MAY 15, 2018

2          A.  No, I don't.

3          Q.  Okay.  Now, did you buy this van for

4   your wife?

5          A.  I did.

6          Q.  And does she typically use the van?

7          A.  Yes.

8          Q.  Is the title in her name?

9          A.  I had the title put in her name, yes.

10         Q.  Okay.  And has she pushed the XM

11  button, to your knowledge?

12         A.  No.

13         Q.  Okay.  When you say it was

14  unconfigured, what -- what exactly do you mean?

15  Can you tell me what you saw when you pushed the

16  button?

17         A.  It was unresponsive.

18         Q.  Any -- it's been a couple of years,

19  but any memory other -- other than that?  Any

20  error message?  Anything -- a number to call?

21         A.  No, there were no numbers.  There was

22  no L -- message on the LCD.  There was nothing

23  displayed.  It just did not work.

24         Q.  Okay.  Well, why did you push it?

25         A.  I had no idea at that point what

1          THOMAS BUCHANAN - MAY 15, 2018

2     Sirius XM was.

3          Q.   Had --

4          A.   We were pushing a lot of buttons in

5     the van to try to figure out all of the features

6     and options.

7          Q.   That's "we," you and Mrs. Buchanan?

8          A.   Yes.

9          Q.   When you saw that the XM was

10    unconfigured, did you contact anybody at Sirius?

11         A.   Oh, no, I -- no.

12         Q.   Okay.  Did you contact anybody at the

13    dealer?

14         A.   No.

15         Q.   Okay.  The number that you provided

16    -- you -- withdrawn.

17              You provided a phone number to Bob

18    Tedford, right?

19         A.   Yes.

20         Q.   Okay.  And that phone number was your

21    landline?

22         A.   Yes.

23         Q.   Do you -- back in 2016, did you have

24    a cellphone?

25         A.   We don't have cell phones.

1      THOMAS BUCHANAN - MAY 15, 2018

2      Q.  Okay.  So neither you nor your wife

3  have a cellphone?

4      A.  No.

5      Q.  So you use the landline as your phone

6  for all purposes?

7      A.  That's correct.

8      Q.  Just bear with me one second.

9          Okay.  So when you -- when you went

10  to Bob Tedford to buy the ban -- the van, did you

11  go multiple times or just on one occasion?

12      A.  As I recall, I went several times,

13  one to test drive it, and I went back

14  subsequently to make the purchase after I

15  determined that that's the one that I wanted to

16  purchase.

17      Q.  And tell me, Mr. Buchanan.  You dealt

18  with more than one person there?

19      A.  Yes.

20      Q.  But you can't remember their names?

21      A.  No.

22      Q.  Okay.  No mention of Sirius XM?

23      A.  No.

24      Q.  And did you go to -- and that was a

25  used van that you purchased, right?

1      THOMAS BUCHANAN - MAY 15, 2018

2          A.   That's correct.

3          Q.   And had you -- say within the last

4    ten years, how many vehicles have you purchased

5    or leased?

6          A.   My guess would have been -- would be

7    one.  I mean, I could check.

8          Q.   Okay.  Right now, at your home you

9    have that van, right?

10         A.   Yes.

11         Q.   Any other vehicles at your house?

12         A.   Yes.

13         Q.   Okay.  What?

14         A.   My Chevy Impala.

15         Q.   Okay.  Any others?

16         A.   No.

17         Q.   All right.  When did you acquire the

18   Chevy Impala?

19         A.   After I -- I purchased the van.  The

20   -- in -- in the same time period.

21         Q.   Okay.  Was that -- was that new or

22   used?

23         A.   No, it's used.

24         Q.   Okay.  You -- you purchased it used,

25   correct?

Page 60

1        THOMAS BUCHANAN - MAY 15, 2018

2        A.  Yes.

3        Q.  You didn't lease it?

4        A.  That's correct.

5        Q.  And where -- what dealer did you

6    obtain it from?

7        A.  Same -- same dealer.

8        Q.  Bob Tedford?

9        A.  Yes.

10       Q.  Did you deal with the same

11   salespeople?

12       A.  Pretty much, yes.

13       Q.  Is it two people?  Three people?

14       A.  I seem to recall two.  There could

15   have been three.

16       Q.  Can you describe the people at all?

17   Is it men?  women?

18       A.  No, they were men.

19       Q.  Okay.  All right.  Okay.  Before the

20   van -- the acquisition of the van, what was the

21   last time you had either leased or purchased a

22   vehicle?

23       A.  It's been quite a while.

24       Q.  Well, what were --

25       A.  It's been longer than ten years.

1        THOMAS BUCHANAN - MAY 15, 2018

2        Q.  I see.  So what -- before

3   May 2, 2016, what vehicle was at your house, if

4   any?

5        A.  We had a Villager, a van.

6        Q.  Okay.  Just the one?

7        A.  Yes.

8        Q.  And for how long had you had that?  A

9   decade?

10       A.  Oh, forever.

11       Q.  You know what.  We'll just stay with

12  that.

13       A.  Okay.

14       Q.  Any other -- besides the Villager,

15  any other -- withdrawn.

16            Have you ever leased a vehicle?

17       A.  I don't think I've ever leased a

18  vehicle in my lifetime.

19       Q.  Okay.  Other than the Villager in the

20  last decade, had -- have you acquired any other

21  vehicle -- other than the Villager, the van, and

22  the Chevy Imp -- the -- withdrawn.

23            Other than the Villager, the Odyssey,

24  and the Chevy Impala?

25            MR. ELLZEY:  Objection.  Form.  I --

1       THOMAS BUCHANAN - MAY 15, 2018
2  I can tell by the look on his face, I think you
3  need to try one more time.
4          MR. ARMSTRONG:  Okay.
5      A.  Well, no.
6          MR. ELLZEY:  Okay.
7      A.  My -- I guess my response is sure,
8  before my Chevy, I had a vehicle that I drove
9  that I actually can't recall what it was at the
10 moment, but sure.
11     Q.  So you had -- at that point you -- at
12 some point, you had both the Villager and
13 whatever this --
14     A.  Yeah.
15     Q.  -- vehicle is?
16     A.  Yeah.
17     Q.  Okay.  And do you recall when you
18 acquired that vehicle?
19     A.  I -- I can check at DMV and let you
20 know when I changed the title.  Do I recall right
21 off the top of my head, no.
22     Q.  Is it 10 years?  Is it a long time?
23     A.  It's -- it's quite a while.
24     Q.  Okay.  In any -- before -- did any of
25 the other -- did any -- withdrawn.

1    THOMAS BUCHANAN - MAY 15, 2018

2        Any vehicle that you ever acquired

3  come equipped with Sirius XM?

4        A.  In the past?

5        Q.  Yes, both.  Yes, in the past.

6        A.  To my knowledge, no.

7        Q.  How about satellite radio generally?

8        A.  No.

9        Q.  And you said in the past.  Has

10  something happened recently where a vehicle you

11  acquired came equipped?

12        A.  No.

13        Q.  Okay.  So never, Mr. Buchanan, have

14  you acquired a vehicle that's come equipped with

15  satellite radio?

16        A.  That's correct.

17        Q.  And that would be -- the same is true

18  for Mrs. Buchanan?

19        A.  I'm -- I'm sure it is, yeah.

20        Q.  Unless there's things you guys need

21  to talk about.

22        MR. ARMSTRONG:  All right.  Want to

23  take a -- take a five-minute break?

24        MR. ELLZEY:  Sure.

25        THE VIDEOGRAPHER:  We are off the

1          THOMAS BUCHANAN - MAY 15, 2018

2     record at 10:05 a.m.

3               (Break from 10:05 a.m. to 10:16 a.m.)

4               THE VIDEOGRAPHER:  This is the start

5     of media No. 2 in the video recorded deposition

6     of Thomas Buchanan.  We are on the record at

7     10:16 a.m.

8          Q.  (BY MR. ARMSTRONG) Okay.

9     Mr. Buchanan, so you provided your home phone

10    number to somebody at Tedford, right?

11         A.  Yes.

12         Q.  And do you have any expectation as to

13    why they needed your home phone number?

14         A.  No, not at all.

15         Q.  Did you ask them not to share it with

16    anyone else?

17         A.  I don't recall.  I can tell you this:

18    That is -- it was my assumption that it would not

19    be shared with anyone for any reason without my

20    prior permission.  Just as when I shared my email

21    address with them, I did not authorize them, nor

22    did I expect them to sell it, give it away, or

23    share it with any other entity.

24         Q.  Okay.  What -- would you have

25    expected a call after you purchased from Bob

1         THOMAS BUCHANAN - MAY 15, 2018

2  Tedford?

3      A.  No.

4      Q.  Would you -- you know what an EBR is,

5  don't you?

6      A.  No.

7      Q.  We'll look at some of the documents.

8        Did you ever research what an

9  established business relationship is?

10     A.  Oh, I'm aware of what an established

11  business relationship is.

12     Q.  Well, is at times maybe you haven't

13  heard this acronym known as EBR?

14     A.  I had not heard the acronym, yes.

15     Q.  Okay.  What is your understanding of

16  established business relationship?

17     MR. ELLZEY:  Object to the form.

18  Object to the extent it calls for a legal

19  conclusion.  If you don't mind, I'm going to get

20  a running objection on the record just as to all

21  questions related to EBR, to the extent they call

22  for a legal conclusion.  He's not a lawyer.

23     Q.  Let's -- let's break it down.  So

24  before -- what your counsel is trying to prevent

25  is that whatever you guys have discussed together

1          THOMAS BUCHANAN - MAY 15, 2018

2     about this issue with EBR, that you not share

3     with me what he or other lawyers of counsel give

4     about in the case.

5               So what I want to do, if we can, and

6     if we can't, you'll tell me, is before you ever

7     engaged this fine attorney, you did some of your

8     own research on established business

9     relationship?

10          A.   Yes.

11          Q.   Okay.  What did do you?

12          A.   I looked at the law.

13          Q.   How did you find the law?

14          A.   I went to the local law library in

15     Collin County.

16          Q.   Okay.  And what did do you there,

17     sir?

18          A.   Did the research and pulled up the

19     law and read it.

20          Q.   And the law you're referring to is

21     what?

22          A.   I'd have to, again, view the document

23     that I looked at.  I looked at several laws.

24          Q.   Okay.

25          A.   Okay.

1       THOMAS BUCHANAN - MAY 15, 2018

2          Q.  And part of that included reading

3    about established business relationships, right?

4          A.  That's correct.

5          Q.  And at some point you commenced a

6    small claims proceeding against Sirius, right?

7          A.  Yes.

8          Q.  And it was your opinion, without

9    having consulted any attorneys, that Sirius did

10   not have an established business relationship

11   with you.  Fair?

12         A.  That's correct.

13         Q.  Okay.  Based on your reading, not

14   your discussions with counsel --

15         A.  Yes.

16         Q.  -- what's your understanding of what

17   an established business relationship is?

18         A.  It's my understanding that an

19   established business relationship is where I

20   would go to Sirius XM's website and click on a

21   please have someone contact me, I'm interested in

22   buying satellite radio.  Or I would -- I would

23   fill out a postcard and send it to the company

24   and say, I'm interested in what you're offering,

25   I'd like to sign up for a 90-day free trial.

1      THOMAS BUCHANAN - MAY 15, 2018

2      Q.  Okay.  Anything else, just in

3  general?

4      A.  Not in general, no.

5      Q.  So for people who may have done that,

6  say a person has gone to a website and clicked on

7  Sirius XM and is interested in the free trial --

8      A.  Yes.

9      Q.  -- those people would have, in your

10 mind, an established business relationship?

11         MR. ELLZEY:  Objection.  Form.

12     A.  Yes.

13     Q.  Okay.  And Bob Tedford, you made a

14 purchase at Bob Tedford, correct?

15     A.  That's correct.

16     Q.  Did you believe you had an

17 established business -- business relationship

18 with Bob Tedford?

19         MR. ELLZEY:  Objection.  Form.

20     A.  As it relates to the van, yes.

21     Q.  Okay.  And would you have expected

22 calls from Bob Tedford about the van?

23     A.  No.

24     Q.  So what if Bob Tedford had called you

25 offering a warranty after your purchase?

1          THOMAS BUCHANAN - MAY 15, 2018

2          A.  I would have told Bob Tedford that

3    I'm not interested, and to please stop calling.

4          Q.  But to your mind, would that first

5    call have been a violation of the do-not-call

6    laws?

7               MR. ELLZEY:  Objection.  Form.

8          A.  It could have been, yes, absolutely.

9          Q.  So is it fair to say that unless you

10   specifically gave consent to use your number to

11   call you, that no company or person should call

12   you?

13              MR. ELLZEY:  Objection.  Form.

14         A.  Absolutely.

15         Q.  Okay.

16              MR. ARMSTRONG:  All right.  Let's

17   mark another exhibit, please.

18              (Exhibit 4 was marked.)

19         Q.  So this is -- we've marked

20   Defendant's Exhibit 4.  It's a document that was

21   produced by your attorneys, Mr. Buchanan, and it

22   bears Bates stamp P, a bunch of zeros, 2 through

23   6.

24              Have you ever seen this document

25   before?

1          THOMAS BUCHANAN - MAY 15, 2018

2          A.  Yes.

3          Q.  Okay.  And what is this?

4          A.  This is a call detail log from AT&T

5    of the incoming calls for a certain time period.

6          Q.  These are incoming calls to your

7    residential landline?

8          A.  That's correct.

9          Q.  And during the period that this

10   covers, that is October 1st, 2014 to

11   October 31st, 2016, was AT&T your only carrier

12   for that landline?

13         A.  That's correct.

14         Q.  All right.  And had you asked AT&T to

15   query for records in this time frame?

16         A.  I subpoenaed these records from AT&T.

17         Q.  All right.

18         A.  They did not willingly provide them.

19         Q.  The "16 calls," whose handwriting is

20   that?

21         A.  That's mine.

22         Q.  All right.  So in reviewing whatever

23   it is AT&T sent you for this time period, you

24   wrote "16 calls," correct?

25         A.  That's correct.

1        THOMAS BUCHANAN - MAY 15, 2018

2        Q.  What did you mean by "16 calls"?

3        A.  That means that I was able during

4  this time period to document 16 different

5  occasions where Sirius XM called me.

6        Q.  Okay.  And in -- and I see that

7  there -- certain numbers are highlighted in

8  yellow.

9        Do you see that?

10       A.  I do.

11       Q.  Are those the calls?

12       A.  Yes.

13       Q.  Okay.  So your only carrier for the

14  period of time that we've been discussing

15  provided you this document and you were able to

16  identify 16 calls, correct?

17       A.  That's correct.

18       Q.  But you claim during this period

19  there were more -- more calls from Sirius XM?

20       A.  No, that's not what I said.

21       Q.  Okay.  During this period of time,

22  October 1st, 2014 to October 31st, 2016, were

23  there more than these 16 calls --

24       A.  No.

25       Q.  -- from Sirius XM?

1    THOMAS BUCHANAN - MAY 15, 2018

2         A.  No.

3         Q.  Okay.

4         A.  There were other calls outside of

5    that time period that I received.

6         Q.  Okay.  But within the time period,

7    these are the calls?

8         A.  Within that specific time period, I

9    was able to document a minimum of 16 calls,

10   that's correct.

11        Q.  Okay.  So at least within -- you

12   didn't receive a call prior to October 1st, 2014

13   from anybody on behalf of Sirius, correct?

14        A.  And again, I have received more phone

15   calls than these 16 calls.  I did not document

16   the dates and the times.  It could have been

17   outside of that time period, yes.

18        Q.  Just what you know, sir.  So you

19   believe you may have received from Sirius XM or

20   somebody on its behalf a phone call prior to

21   October of 2014?

22        A.  I could have, yes.

23        Q.  But you just don't know?

24        A.  I did not document, so I do -- I do

25   not know.

1       THOMAS BUCHANAN - MAY 15, 2018

2       Q.  Okay.  And -- but during this period,

3    based on the records of your only carrier, we

4    know how many you can document, correct?

5       A.  That's correct.

6       Q.  All right.  And I will tell you that

7    looking at this and looking at the list you had

8    before, these calls do not begin until a month

9    after you received that welcome kit.

10          Do we agree with that?

11          MR. ELLZEY:  Objection.  Form.

12      A.  I agree with that, yes.

13      Q.  Okay.

14      A.  Even though I -- as I have stated, I

15   received calls prior to receiving that welcome

16   kit that I did not document on my spreadsheet

17   that are not documented on Exhibit 1, page 1.

18      Q.  And not documented by your carrier's

19   list of all of the calls from this number to you

20   during this period of time?

21      A.  No, that -- that's incorrect, your

22   statement.

23      Q.  Okay.  Well, let's correct it then.

24   During this period of time --

25      A.  And again, it's the "during this

1           THOMAS BUCHANAN - MAY 15, 2018

2    period of time."  During this period of time I

3    received these 16 phone calls.

4           Q.  Right.

5           A.  We're talking about outside of that

6    period of time.

7           Q.  Okay.  What's the period of time

8    during which you received these 16 phone calls?

9           A.  Well, based on this document, it is

10   from 10/1/14 to 10/31/16.

11          Q.  Okay.  And how many calls did you

12   receive from or on behalf of Sirius XM during

13   that period of time?

14          A.  16 phone calls.

15          Q.  Okay.  And prior to that period, how

16   many calls did you receive?

17          A.  Numerous calls --

18          Q.  Okay.  So --

19          A.  -- that I did not document on my

20   spreadsheet that are not included on Exhibit 1,

21   page 1.

22          Q.  Mr. Buchanan, let me just finish.  I

23   know it's not a natural thing.  Just let me

24   finish the question so that we can get a clear

25   record.  Okay.

1    THOMAS BUCHANAN - MAY 15, 2018

2         Prior to this period of time, how

3    many calls did you receive -- and by the way,

4    "prior to this period of time" means prior to

5    October 1st, 2014 -- how many calls did you

6    receive by or on behalf of Sirius XM?

7         A.  And my response is I did not document

8    the calls.  I received several calls.

9         Q.  That's what I'm trying -- so several?

10        A.  Yes.

11        Q.  2014 and prior, you received several

12   from Sirius XM?

13        A.  Outside of this time period.

14        Q.  That's -- we're talking about before

15   this time period.  In a second I'm going to talk

16   about after this time period.

17        A.  Okay.

18        Q.  But right now, we've talked about the

19   time period, right?

20        A.  Okay.

21        Q.  Now, prior to the time period, prior

22   to October 1st, 2014, what's your estimation as

23   to how many calls you received from Sirius XM?

24        A.  I did not document the calls that I

25   received before nor after, but I did receive

1          THOMAS BUCHANAN - MAY 15, 2018

2    several calls.

3          Q.  Even if you didn't document, how many

4    calls?  A thousand?

5          A.  Not a thousand.

6          Q.  Your best estimate?

7          A.  My best guess?

8          Q.  Yeah.

9          A.  I would say 10, 15.

10         Q.  And that's before this period?

11         A.  Before and after this per- -- this

12   period of the 16 documented phone calls, that's

13   correct.

14         Q.  And -- okay.  And did you -- if

15   that's the case, why did you ask AT&T to query

16   only during this period?

17         A.  Because at the time that I created

18   the subpoena, I looked at my spreadsheet and I

19   looked at the time period where I had documented

20   the phone calls, and it's that time period --

21   that's the time period I asked for.

22         Q.  Okay.  The ones -- the calls that

23   you're telling us about now, either before or

24   after the period, how did you know they were

25   coming from Sirius XM?

THOMAS BUCHANAN - MAY 15, 2018

1

2        A.   I assumed based on the number, or the

3   LCD.

4        Q.   And what number was that?

5        A.   I assume the same number.  I don't

6   know.  Again, I didn't write it down.  I didn't

7   document it.

8        Q.   How did you know the number?  Did it

9   show up on your home phone?

10       A.   Yes.

11       Q.   Okay.  And is it the same number as

12   in these records?

13       A.   I can't testify to that.

14       Q.   Only --

15       A.   Many -- many call centers use many

16   different numbers.  So I don't know.

17       Q.   Okay.  Did the -- any of the other

18   cars -- you said you purchased another car

19   shortly after -- another vehicle shortly after

20   the purchase of the Odyssey, correct?

21       A.   That's correct.

22       Q.   And did that come equipped with

23   Sirius XM or any satellite radio?

24       A.   And as I have stated before to your

25   question, no other vehicle that I have owned in

1           THOMAS BUCHANAN - MAY 15, 2018

2    my lifetime, to my knowledge, has had Sirius XM

3    as a feature.

4           Q.  Did you receive any calls from anyone

5    in connection with your purchase of any other

6    vehicle?

7           A.  Absolutely not.

8           Q.  Have you ever spoken with anyone at

9    Sirius or on behalf of Sirius?

10          A.  When I initially called the number

11   that was calling me to find out who was calling,

12   they identified themself as Sirius XM.

13          Q.  Tell me everything you can recall

14   about that phone call.

15          A.  The only recollection I have is

16   generally to find out who's calling.  I called

17   the number back.  I listened to the receptionist

18   who picks up the phone and says, this is Sirius

19   XM, may I help you, and that tells me who called.

20          Q.  And --

21          A.  And I say thank you and I hang up.

22          Q.  Okay.  And that's the first and only

23   time you've ever done that?

24          A.  Yes.  I -- I didn't know Sirius XM

25   existed before the phone calls.

1        THOMAS BUCHANAN - MAY 15, 2018

2        Q.  So even back in 2014 and before, when

3   you were receiving these calls that you claim you

4   recalled -- remembered from Sirius XM, you did

5   not call the number and find out that it actually

6   was Sirius XM?

7        A.  That's correct.

8        Q.  Is it possible you're just wrong, it

9   wasn't Sirius XM?

10       A.  You know, anything's possible, sure.

11           MR. ARMSTRONG:  Okay.  Let's mark

12   this.

13           (Exhibit 5 was marked.)

14       Q.  Okay.  We've marked as Defendant's

15   Exhibit 5, a letter that's addressed to Deborah

16   Buchanan, the top right-hand which says,

17   "Welcome" with an exclamation point.  You've seen

18   this letter before, correct?

19       A.  I have.

20       Q.  All right.  Is this the -- in

21   Paragraph 32 of your complaint -- and I'll give

22   you a second to get there.  Take your time.  And

23   please review 32, and then the question I have

24   is:  Is this the free trial offer that you're

25   referring to in Paragraph 32?

THOMAS BUCHANAN - MAY 15, 2018

1

2        A.   It is.

3        Q.   Okay.  So who opened the welcome kit?

4        A.   I don't recall.  It could have been

5   me.  It could have been my wife.

6        Q.   Did you both read this letter?

7        A.   I know I did.  I -- I can't testify

8   to whether she read it or not.

9        Q.   Of course.  Okay.  So then you see

10   that it says, "Your new Honda Odyssey includes a

11   3-month trial subscription."

12            Do you see that?

13        A.   Yes.

14        Q.   So that told you that you already had

15   the trial subscription?

16            MR. ELLZEY:  Objection.  Form.

17        A.   That told me that we were being

18   offered a free trial.  It doesn't mean that we

19   requested it.  It doesn't mean that we asked for

20   it.  It doesn't mean that we wanted it.

21        Q.   Fair enough.  But you do see that, at

22   least according to this letter, it advises you

23   that it is already active and ready for you to

24   enjoy?

25        A.   Based on this letter, that's correct.

1      THOMAS BUCHANAN - MAY 15, 2018

2          Q.  Okay.  And then you see down below

3      the blue legend, it says, "Important information

4      about your trial."  The middle says, "How we

5      communicate."

6              Do you see that?

7          A.  Uh-huh.

8          Q.  It says, "Sirius XM may contact you

9      by mail, phone, or email to discuss subscription

10     options."

11             Do you see that?

12         A.  Uh-huh.  That's correct.

13         Q.  Now, you read that at the time,

14     right?

15         A.  I'm sure I did.

16         Q.  Okay.  And did you ever contact

17     Sirius XM to indicate any preference you've had

18     for either not being contacted or contact by

19     email or anything else?

20         A.  I sent them an email -- or I sent

21     them a letter saying, please don't contact me.

22         Q.  That's the July 24th --

23         A.  Yes.

24         Q.  -- letter, correct?  Okay.

25             So if you received this in June --

1          THOMAS BUCHANAN - MAY 15, 2018

2    sometime in June, it wasn't until the end of July

3    that you sent them that letter?

4          A.  I don't recall when I actually

5    received this.  I can -- I can say that Sirius is

6    very smooth in that they didn't -- they -- that I

7    don't recall them ever dating any of the

8    propaganda that they sent regarding their

9    product.

10         Q.  Where --

11         A.  There are -- there are no dates on

12   anything that they sent.

13         Q.  Well, you'll see on this page, right,

14   it says, "Your account information," and it has a

15   radio ID and it says, "The trial end date is

16   August 2nd, 2016."

17              Do you see that?

18         A.  And my response to that is I receive

19   offers from Verizon, I've -- I just received an

20   offer from AARP saying, you have a free

21   subscription for X number of days, here's a dummy

22   little card that you can use.  It -- it doesn't

23   mean I requested it.  I doesn't mean I'm going to

24   use it.  It doesn't mean that we asked for it.

25         Q.  So you were offered a free trial to

1           THOMAS BUCHANAN - MAY 15, 2018
2    AARP?
3           A.  Yes.
4           Q.  Okay.  Did you have -- do you have a
5    relationship with AARP?
6                MR. ELLZEY:  Objection.  Form.
7           A.  No.
8           Q.  Did AARP ever call you?
9           A.  No.
10          Q.  How about Verizon, do you have any
11   sort of --
12          A.  No.
13          Q.  -- business relation -- just so Kim
14   can get it down, do you have any sort of business
15   relationship with Verizon?
16               MR. ELLZEY:  Objection.  Form.
17          A.  No.
18          Q.  Okay.  Has Verizon ever phoned you?
19          A.  No.
20          Q.  Have you ever availed yourself of a
21   free trial to any service for a product?
22               MR. ELLZEY:  Objection.  Form.
23          A.  Not to my knowledge that I can
24   recall, no.
25               I might also add here that I didn't

1      THOMAS BUCHANAN - MAY 15, 2018

2   know what Sirius XM was.  I would never use

3   Sirius XM.  I wouldn't -- I wouldn't sign up for

4   a free trial for Sirius XM, not because it's a

5   bad product, only because I think people are very

6   foolish who do that.  There are hundreds of

7   thousands of radio stations that are free.

8           People in today's world sign up and

9   pay $100 a month for cable TV and they get their

10  hundred channels that they buy every -- every

11  30 days.

12          Q.  Right.

13          A.  I -- I paid $39 for an antenna.  I

14  have free TV at home.  I just -- it's not a

15  product that I would ever be interested in.

16          Q.  Understood.

17          A.  And even if the button had worked in

18  the van, which it has never, does not, nor do I

19  ever want it turned on, I wouldn't use it.  Why?

20          Q.  Can we at least agree, though,

21  Mr. Buchanan, that not everyone is like you.

22  Fair?

23          A.  There are many people that waste

24  their money, yes, we agree.

25          Q.  Okay.  So many people will take

1          THOMAS BUCHANAN - MAY 15, 2018

2    advantage of the trial subscription to Sirius XM,

3    right?

4               MR. ELLZEY:  Objection.  Form.

5          A.  There's an idiot born every moment,

6    yes.

7          Q.  Okay.  And some people will pay for

8    it, because unlike you, they actually enjoy the

9    service, right?

10              MR. ELLZEY:  Objection.  Form.

11         A.  Obviously, or the company wouldn't be

12   in business.

13         Q.  Right.  And there are people who

14   would push the button and avail themselves of the

15   service during the free trial --

16              MR. ELLZEY:  Objection.  Form.

17         Q.  -- even though you did not?

18         A.  I assume so.

19         Q.  And not everybody has -- what kind of

20   music do you like to listen to?

21         A.  I like all kinds of music.

22         Q.  Is there any particular kind you like

23   the most?

24         A.  I like everything from country

25   western to oldies and everything in between.

1      THOMAS BUCHANAN - MAY 15, 2018

2      Q.  How about Mrs. Buchanan?  What are

3  her musical tastes?

4      A.  I would say she likes country and

5  western and maybe a little classic.

6      Q.  Do you think that is the same as

7  everyone else who was offered a free trial, that

8  their music tastes are precisely what yours and

9  Mrs. Buchanan's are?

10         MR. ELLZEY:  Objection.  Form.

11     A.  No, I don't.

12     Q.  I mean, the fact is you can't say

13  what their tastes are, right?

14     A.  That's correct.

15     Q.  And you can't testify as to what

16  their dealings were when they went to purchase

17  their own cars?

18         MR. ELLZEY:  Objection.  Form.

19     A.  That's correct.

20     Q.  So you don't know what those people

21  discussed with the salespeople in terms of Sirius

22  XM, if anything?

23         MR. ELLZEY:  Objection.  Form.

24     A.  That's correct.  I wasn't there.

25     Q.  Right.  Now, the welcome package and

1         THOMAS BUCHANAN - MAY 15, 2018

2  this letter that we've looked at, Defendant's

3  Exhibit 5, where have you kept that?

4         A.  Can I interject a comment at this

5  point regarding Exhibit 5 that you just handed

6  me, how we communicate?

7         Q.  I'd normally say no, but sure.

8         A.  Okay.  It said Sirius XM may contact

9  you by mail, phone, or email to discuss

10  subscription --

11         Q.  Subscriptions, yeah.

12         A.  -- options.  I -- I would not -- you

13  know, I object to the phone calls, but I also

14  object to them not leaving a message on the

15  answering machine.

16         Q.  And why is that, sir?

17         A.  Because any corporation or individual

18  selling a product, if you're not at home, should

19  leave a message.  And to continually call my home

20  day after day, week after week and not -- not

21  communicate, you know, hang up after four rings

22  or three rings, whatever it is, it's wrong.

23         Q.  Okay.  So you --

24         A.  It's harassment.

25         Q.  So you would have rather that they

1          THOMAS BUCHANAN - MAY 15, 2018

2    actually communicate about their service?

3          A.  Yes.

4          Q.  Okay.  And -- all right.  Have you

5    finished your comment?

6          A.  Yes.

7          Q.  Okay.  So after you purchased the van

8    from Bob Tedford and you receive this welcome

9    kit --

10          A.  Yes.

11          Q.  -- you received calls from Sirius XM,

12    correct?

13          A.  Yes.

14          Q.  All right.  From Sirius XM's

15    perspective, do you have any understanding of why

16    they were trying -- why they were trying to reach

17    you?

18          A.  I had no idea.  All I knew is a

19    certain number kept calling my home and

20    interrupting my rest and my sleep.  At no time

21    have I ever talked to a Sirius XM employee except

22    when I called the number and had the receptionist

23    say, this is Sirius XM, and I said, thank you,

24    and hung up.  And at no time have they ever left

25    a message.

```
 1            THOMAS BUCHANAN - MAY 15, 2018
 2        Q.  Even though the -- the calls
 3   interrupted your sleep, do you think from Sirius
 4   XM's perspective, it was reasonable to think you
 5   might have expected a call?  Is that fair?
 6            MR. ELLZEY:  Objection.  Form.
 7        A.  No, absolutely not.
 8        Q.  Okay.  Did you ever, when you -- have
 9   you ever until today called back Bob Tedford
10   about providing your phone number to Sirius XM?
11        A.  No, not ever.
12        Q.  Okay.  So going back to where --
13   before you made your statement, I was asking you
14   where you actually kept Defendant's Exhibit 5.
15   Is that in that folder in your bedroom?
16        A.  Yeah, I'm sure it is.
17        Q.  Okay.
18        A.  Sure.
19        Q.  How large is the folder?  Is it, you
20   know --
21        A.  It's quite thick.  It's larger than
22   the binder that you have in front of you.
23        Q.  Okay.  So 5 inches?  7 inches?
24        A.  Yes.
25        Q.  Okay.  The binder is not on video, so
```

1      THOMAS BUCHANAN - MAY 15, 2018

2  I wanted to describe it for the record.

3      A.  Yes.  Sure.

4      Q.  Okay.  When it comes to -- let's go

5  back to your purchase of the Odyssey van.

6      What features of the vehicle were

7  important to you?  What mattered most?

8      A.  That's a good question.

9      Q.  Thank you.

10     A.  I would say, first of all, it had to

11 be a van.  Second of all, it had to be a -- not a

12 late model, this year or last year van.  We're

13 looking for something that didn't have a lot of

14 whistles and bells on it.  So -- and it -- and

15 primarily the other thing that we looked for is

16 it had to have third row seating inside.

17     Q.  Okay.

18     A.  As -- as far as GPS navigation,

19 satellite radio, you know, the frills, we

20 could -- we could have cared less.

21     Q.  Okay.  So as far as those extra

22 features of the car, the Buchanans just

23 personally, they don't care for those?

24     A.  No.

25     Q.  All right.  So you were more

1          THOMAS BUCHANAN - MAY 15, 2018

2    interested, as you've said, in the vintage of the

3    car, what year it was, and making sure you get

4    that third row?

5          A.  Yes.

6          Q.  And that it be a van?

7          A.  Yes.

8          Q.  All right.  But, of course, there are

9    others that -- not the Buchanans -- who do care

10   about the bells and whistles, as you've put it,

11   correct?

12          MR. ELLZEY:  Objection.  Form.

13          A.  I assume so, yes.

14          Q.  Who might be very interested in a

15   feature of the purchase such as OnStar?

16          MR. ELLZEY:  Objection.

17          A.  There are many people who like to

18   waste their money, yes.

19          Q.  Your opinion about that is clear, and

20   I hear you.

21          A.  Okay.

22          Q.  Okay.  So -- but there are those

23   people, right?

24          MR. ELLZEY:  Objection.  Form.

25          A.  Yes.

1    THOMAS BUCHANAN - MAY 15, 2018

2    Q.  And there are those people, too, who

3    do want the selection of music stations that

4    Sirius XM offers, correct?

5         MR. ELLZEY:  Objection.  Form.

6    A.  That's correct.

7    Q.  All right.  Anything else that you

8    and Mrs. Buchanan were looking for in terms of

9    your approach and your attitude about buying the

10   Odyssey van?

11   A.  Just a good, solid van, well made

12   that had comfortable seats, third row seating and

13   seats that would go down inside the floor were

14   what we primarily looked for.

15   Q.  Okay.

16   A.  I mean, there might have been one or

17   two other issues or features, but certainly not

18   satellite radio.

19   Q.  How about -- I mentioned OnStar.

20   Have you ever used OnStar?

21   A.  No.

22   Q.  Okay.

23   A.  I would never use OnStar.

24   Q.  I think I could have predicted that.

25   A.  Okay.

1        THOMAS BUCHANAN - MAY 15, 2018

2             MR. ARMSTRONG:  Can I give you this?

3    I'm not --

4             Can we mark that, please.  That

5    should be 6.

6             (Exhibit 6 was marked.)

7        Q.  Okay.  For the record, we've marked a

8    document that's titled "Plaintiff's Objections

9    and Answers to Sirius XM's First Set of

10   Interrogatories."  And my first question,

11   Mr. Buchanan, is, have you ever seen this

12   document before?

13       A.  I don't know that I have or haven't.

14   It looks familiar, but I can't swear to it.

15       Q.  Okay.

16       A.  When you have as many legal law firms

17   involved in a case, there have been numerous

18   documents going back and forth.

19       Q.  Okay.  Who -- who have you -- which

20   lawyer or lawyers have you dealt primarily with?

21       A.  Primarily with Jarrett at my request.

22   I don't want to know and don't -- have not asked

23   and have no need to know, nor do I want to know

24   the interactions that his firm is having with the

25   other ones because they each play a very

1          THOMAS BUCHANAN - MAY 15, 2018

2     important role, and I don't care to get into the

3     nitty gritty.

4          Q.  Who -- who -- who did you hire?

5          A.  I hired Jarrett.

6          Q.  Okay.  So you initially didn't hire

7     any other firm?

8          A.  Oh, ab- -- no.

9          Q.  Okay.  How did the other firms get

10    involved?

11          MR. ELLZEY:  Hold on.  We're getting

12    real close to --

13          MR. ARMSTRONG:  All right.  Let me --

14    let me try it this way.

15          MR. ELLZEY:  Okay.

16          MR. ARMSTRONG:  Well, I think I got

17    it.

18          Q.  So you yourself did not reach out to

19    these other firms, correct?

20          MR. ELLZEY:  Objection.  Form.

21          A.  Prior -- prior to Jarrett, I have

22    reached out to a number of law firms across the

23    country.

24          Q.  I mean the firm -- can you tell me

25    the names of the firms -- without looking at a

1          THOMAS BUCHANAN - MAY 15, 2018

2     document --

3          A.  No.

4          Q.  -- that represent you now?

5          A.  Oh, Jarrett.

6          Q.  Other than Jarrett?

7          A.  Yeah, I -- I have a list at home.

8          Q.  No, I'm saying, you can --

9          A.  I mean, I -- no, I cannot recall off

10    the top of my head, no, but, yes, I'm aware of

11    who they are.

12         Q.  Okay.  So initially you retained

13    Jarrett's firm, correct?

14         A.  Yes, with the assumption that Jarrett

15    and I would build a team of firms and attorneys

16    to get this brought to court.

17         Q.  Okay.  Number 10, so if you turn to

18    page -- the bottom it has Page 7 of 10.

19         A.  Okay.

20         Q.  And the question was to identify all

21    persons whom you believed to be witnesses who can

22    corroborate any of the allegations made in the

23    complaint, including any person whom you intend

24    to call as a fact witness in this litigation.

25              Do you see that?

1            THOMAS BUCHANAN - MAY 15, 2018

2       A.  Yes.

3       Q.  Okay.  So you identified yourself and

4  others at Sirius, but you also identified Deborah

5  Buchanan, right?

6       A.  That's correct.

7       Q.  And what information does

8  Mrs. Buchanan have that can corroborate your

9  allegations in the complaint, if any?

10       A.  I informed her of the phone calls

11  that I received.

12       Q.  Okay.

13       A.  I kept her abreast at a very broad

14  level.  She has very limited knowledge as to the

15  workings of this.  She has knowledge that, A, we

16  received numerous phone calls at home.  She has

17  knowledge that I went to the local police

18  department and had them verify who was calling

19  our home, and she has knowledge that I have --

20  I've documented a number of the phone calls that

21  I received that Sirius made to my home.

22            She also has knowledge at a broad

23  level that I intend on prosecuting the

24  corporation or the individual that have made

25  these phone calls.  As far as specifics, she

1          THOMAS BUCHANAN - MAY 15, 2018
2    doesn't have a lot of detailed knowledge.
3          Q.  Is it fair -- is it fair to say that
4    her knowledge, what she does know, is all
5    derivative of what you know?
6          A.  It's -- it's what I've told her, yes.
7          Q.  Right.  I'm trying to figure out
8    what -- sort of in broad strokes what we need to
9    ask her about.
10         A.  Okay.
11         Q.  And so am I right that any
12   information she has about this case or the
13   dispute has come from you?
14         A.  That is correct.
15         Q.  All right.  Now, when you said you
16   intend to prosecute this corporation, what
17   exactly do you mean, Mr. Buchanan?
18              MR. ELLZEY:  Objection.  Form.
19         Q.  You can answer.
20              THE WITNESS:  I can answer?
21              MR. ELLZEY:  You can answer, if you
22   know.
23              THE WITNESS:  Okay.
24         A.  And my broad answer is I intend on
25   building a legal team that I have done -- that

1          THOMAS BUCHANAN - MAY 15, 2018

2    has occurred and prosecuting this corporation not

3    only on behalf of myself, but hopefully at a

4    class action level to get this company to cease

5    their -- their poor business practices.

6          Q.  Okay.  And what --

7          A.  And I might also add, I expect to be

8    issued a check.

9          Q.  Any idea how much?

10         A.  Oh, I --

11              MR. ELLZEY:  Objection.  Form.

12         A.  I want as much as I can get.  I

13   want -- I want all of the other people in this

14   class-action suit that they've done to -- to

15   receive checks to.  This is unacceptable.  It's

16   inexcusable to have 44 Attorney Generals go after

17   your corporation and to prosecute you and for you

18   to pay them millions of dollars and to not clean

19   up your business practices and to stop these

20   phone calls.  It's unacceptable.

21         Q.  Okay.  So the business practices that

22   you'd like to see cleaned up are what exactly?

23         A.  In my particular case, I have no

24   problem with Sirius XM trying to sell their

25   product to new car owners.  I would like to see a

1          THOMAS BUCHANAN - MAY 15, 2018

2    forum where there is a check box when you buy the

3    vehicle or you initial it saying, I would like to

4    sign up for the 30-day or the 90-day or the

5    six-month free trial program and let the consumer

6    choose.

7              But for your corporation to start

8    making millions of phone calls to private owners,

9    to private residences without their permission,

10   without ever requesting a free service, it's

11   unacceptable.

12        Q.  Okay.  Have you ever -- have you

13   talked to anybody else who is potentially in the

14   class you'd like to represent?

15        A.  I have not, no.

16        Q.  In 14, it says, "Plaintiff has not

17   filed any petition for bankruptcy."  This is on

18   Page 8.

19        A.  Page 8?

20        Q.  Yeah, Page 8 at the bottom, but the

21   number of the interrogatory is No. 14.

22        A.  Okay.  Sure.

23        Q.  Did you ever see this answer to this

24   question?

25        A.  I did.

1          THOMAS BUCHANAN - MAY 15, 2018

2          Q.  And that is the answer that you have

3     not filed any petition for bankruptcy?

4          A.  That's correct.

5          Q.  But that's false, right?

6          A.  That -- that is incorrect as I stated

7     it, yes.

8          Q.  Okay.  What's incorrect about it?

9          A.  There are two instances where --

10    well, and I'm still not quite sure if -- I'm

11    still not quite sure if what I did is defined as

12    filed a petition for bankruptcy and gone through

13    the process.

14          I have two occasions where on the --

15    the first occasion is I went and retained an

16    attorney because we had a situation where the

17    mortgage company, GE Capital, could not produce

18    an accurate coupon book that went on for a period

19    of three years.

20          Q.  Right.

21          A.  And I recorded the phone calls that

22    I -- that we made, both my wife and I, to GE

23    Capital representatives who they said, oh, we'll

24    take care of it, it's an oversight on our part,

25    we'll fix it and re-issue you a coupon book.  We

1          THOMAS BUCHANAN - MAY 15, 2018

2   apologize so sincerely, and this went on for

3   three years.

4          And finally I drew a line in the sand

5   and I said, you know, enough is enough.  I'll go

6   get an attorney, because at that point I had had

7   all the written communications back and forth

8   documented.  I had recorded phone calls where I

9   had tapped my own phone.  I put the box on the

10  attorney's desk, and I said, this is the

11  situation.  What do you recommend?

12          And he said, Mr. Buchanan, I would

13  recommend that we go ahead and litigate this, and

14  in order to do that, we may need to file the

15  bankruptcy petition, but we may withdraw it, and

16  I really -- since that occurred 20 or 25 years

17  ago, I didn't know if we had actually gone all

18  the way through the process.

19          I know -- I can tell you that GE

20  Capital responded by me getting an attorney and

21  threatened to accelerate the note because I

22  stopped making payments purposely.  And I said,

23  until I receive an accurate coupon book, you will

24  not receive another dollar.

25          They accelerated the note.  I had my

1          THOMAS BUCHANAN - MAY 15, 2018

2   attorney -- I had my attorney take over at that

3   point.  He said, I want you to let them go ahead

4   and sell your home on the courthouse steps, at

5   which point, step back and I'll -- I'll take

6   over.  And we did, and at that point it was a lot

7   of game playing, legal maneuvering, and

8   30 seconds before we walked into the courtroom to

9   have the case heard, the attorney for GE Capital

10  said, no, we'll settle this out of court.  The

11  Buchanans will get their house back and, you

12  know, so that was the first instance.

13          Did -- I don't recall if we actually

14  went all the way through the bankruptcy process.

15  I don't know if your question in -- I didn't know

16  if your question in 14, "Have you ever filed a

17  petition for bankruptcy," I was unclear as to how

18  to answer that because I'm still to this day not

19  sure if we went all the way through the process.

20          The second occasion is when my wife

21  was having the mechanical issues with the car, I

22  looked at her and I said, we're going to go buy a

23  car, brand-new car.  We went, we looked, we

24  picked one out, and I even told the salesman, I

25  said, I don't want to know the name of your

1        THOMAS BUCHANAN - MAY 15, 2018

2   service manager, I don't want to see the inside

3   of your service bay for a year.  I don't want any

4   problems with this vehicle.

5            Within several days, the vehicle that

6   we had purchased was taken back to their service

7   department, and for approximately a 30-day

8   period, it was in their possession more than it

9   was in ours being fixed.

10       Q.  Right.

11       A.  At which point I looked at my wife

12  and I said, you know, we're not -- we're not

13  going to keep the vehicle.

14            So we had it cleaned, we drove it

15  back to the dealer, we handed them the keys and

16  said, you keep the vehicle, and they said, no,

17  you can't do that.  And I said, I just did, and

18  they said, well, we'll -- you know, we'll

19  prosecute you, we'll come after you for full

20  payment, at which point I said, make my day.  And

21  they did, and I -- I filed the -- I believe I

22  filed the petition for bankruptcy, but I'd --

23  again, that was 20 or 25 years ago.

24            I think at that point they backed up

25  and it was dismissed with or without prejudice,

1          THOMAS BUCHANAN - MAY 15, 2018

2     or whatever the legal term is.

3              So I probably did not answer that

4     correctly when I was asked, but I mean, my wife

5     even had to remind me at some point that we had

6     filed -- at least initially filed the papers for

7     bankruptcy.  But again, I've -- I would have to

8     check the record.  I'm sure you can and have as

9     to whether or not we actually went through the

10    whole process.

11              (Exhibit 7 was marked.)

12         Q.  All right.  For the record, we've

13    marked as Defendant's Exhibit 7 a document titled

14    "Petition, Small Claims Case" bearing Bates

15    stamp -- well, it has various plaintiff's Bates

16    stamp.  I'm not going to ask you about the entire

17    document, just several portions.  Feel free to

18    look at the whole thing, Mr. Buchanan.

19              (Witness reviewing document.)

20         Q.  Oh, you're waiting on me.  So you

21    recognize this petition, correct?

22         A.  Yes.

23         Q.  And this first page -- this first

24    page that we're looking at contain your

25    handwriting?

1      THOMAS BUCHANAN - MAY 15, 2018

2          A.  Yes.

3          Q.  And do you see there's a box you can

4    check to give your consent to be sent by email

5    address to you?

6          A.  Yes.

7          Q.  And is that your email?

8          A.  Yes.

9          Q.  And that's thomasfbuchanan@gmail.com?

10         A.  Yes.

11         Q.  And the emails that were sent to you

12   by Sirius XM, were they sent to that email

13   address?

14         A.  Yes.

15         Q.  Have you, in the past five years,

16   used any other email address?

17         A.  No.

18         Q.  Okay.  On the third page in, there's

19   a reference to nine phone calls.

20             Do you see that?

21         A.  Yes.

22         Q.  That's your handwriting, correct?

23         A.  Yes.

24         Q.  So as of the date of this document,

25   it bears a file stamp August 2nd, 2016, you're

1          THOMAS BUCHANAN - MAY 15, 2018

2    referring to only nine phone calls, correct?

3          A.  That's correct.

4          Q.  And why is that?

5          A.  I don't -- I don't understand the

6    question, why is that.

7          Q.  Well, you had been -- you told us

8    several times today that you had received not

9    only more phone calls than nine, but more phone

10   calls than 16, correct?

11         A.  Correct.

12         Q.  So why is it that you only put here

13   that you received nine phone calls?

14         A.  Oh.  Well, the answer is pretty easy.

15   The -- I was trying to keep the amount that I was

16   suing for under the judicial limit for that

17   court.

18         Q.  Any other reason?

19         A.  No.

20         Q.  Okay.  Let's go back to --

21         A.  Well, no, let me -- let me further

22   clarify.  And it was my intention after this case

23   was heard to go ahead and again sue for the

24   remaining phone calls.

25         Q.  And when you say, "this case was

1          THOMAS BUCHANAN - MAY 15, 2018

2    heard," you're referring to the petition that's

3    Defendant's Exhibit 7?

4          A.   That's correct.

5          Q.   So what you were doing is in order to

6    stay under the jurisdictional limit, you were

7    splitting your claims?

8          A.   That's correct.  Yes.

9          Q.   Okay.  That ultimately was dismissed,

10   correct?

11         A.   Yes.

12         Q.   For violation of the jurisdictional

13   limit?

14         A.   Yes.

15         Q.   All right.  Let's go back to

16   Defendant's Exhibit 1.

17         A.   Okay.

18         Q.   Okay.  And here this is another

19   petition you prepared we looked at earlier?

20         A.   Yes.

21         Q.   And the total amount of damages

22   sought here is $10,000?

23         A.   Yes.

24         Q.   And now you're up to 15 phone calls,

25   correct?  At least that's what it says in the box

1      THOMAS BUCHANAN - MAY 15, 2018

2  on page 2, seeking $500 per call, 15 phone calls

3  to date?

4      A.  Yes.

5      Q.  Okay.  All right.  If you'd turn --

6  keep turning the pages, please, until you get to

7  the document that bears Bates stamp SXM 002242.

8      A.  Okay.

9      Q.  All right.  Do you have a -- do you

10  know what this document is?

11      A.  It's a --

12      Q.  Well, for the record, just so when

13  I'm reviewing it I know exactly what I'm talking

14  about, it has a letterhead of Thomas F. Buchanan

15  with your address, and it's dated August 1, 2016?

16      A.  Uh-huh.

17      Q.  Okay.  Is this the request you sent

18  to Sirius XM requesting the do-not-call policy?

19      A.  I would assume so.  I can't tell by

20  the document that you've provided me.

21      Q.  Well, the document I provided you is

22  what you provided me.

23      A.  Okay.

24      Q.  So I'm trying to see if you have a

25  copy that doesn't have the certified mail receipt

1          THOMAS BUCHANAN - MAY 15, 2018

2   and the other receipt blocking the text.

3          A.  Okay.  And I -- I would say more than

4   likely I do.  I would have to check, but yes.

5          Q.  Okay.  Why on August 1, 2016, were

6   you requesting a copy of Sirius XM's do-not-call

7   policy?

8          A.  Because I wanted to lit -- litigate

9   the corporation because in addition to the phone

10  calls that were not requested, there is a part of

11  the law that says that if I request a copy -- a

12  written copy of your do-not-call list -- or your

13  do-not-call policy and you fail to provide it, I

14  can also sue you for that infraction also.

15         Q.  Okay.  Did Sirius XM provide you a

16  copy of the do-not-call policy?

17         A.  They did.

18         Q.  And that was by -- by paper mail or

19  by email?

20         A.  They provided it by U.S. Mail.

21         Q.  Okay.  The next page is a document,

22  do you see it says service ID number at the top?

23         A.  Yes.

24         Q.  Now, is this a form document or

25  something that you prepared?

1       THOMAS BUCHANAN - MAY 15, 2018

2       A.  No, this is a document that I

3  created.

4       Q.  Okay.

5       A.  This is a document that I use in all

6  of my calls that I provide to the local police

7  authority to verify who's calling.

8       Q.  When you say all of your calls, what

9  do you mean?

10      A.  It means that when I initially

11  contacted the police department regarding these

12  phone calls and opened the case, I was told we're

13  too busy, we don't have time for this, we don't

14  have the resources, we don't have the money,

15  we're too busy catching bank robbers and child

16  abductors and whatever.  And I said, Okay.

17  You've told me what you can't do.  Now tell me

18  what you can do, what you would be willing to do.

19  And they said, Well, what do you mean?  And I

20  said, Well, if I write five questions on a sheet

21  of paper, would you be willing to call the number

22  that called -- keeps calling my home and ask them

23  those five questions, and would you sign it and

24  date it?  And they said, Well, sure, we can do

25  that.  We -- we would be willing to do that.  And

1       THOMAS BUCHANAN - MAY 15, 2018

2   I said, Fine.  Then let's start there.  And

3   that's how this form was created.

4          Q.  I see.  Do you believe that your

5   problems with receiving calls you did not ask for

6   are as grave as child abductions?

7          A.  Given what I've gone through and the

8   over 3,000 phone calls that I've received to

9   date, I think it is just as bad, yes.

10         Q.  Okay.

11         A.  Yes, absolutely.

12         Q.  You used the number 3,000.  Where did

13  you get that number from?

14         A.  That's the approximate total number

15  of calls that I have documented to date on a

16  spreadsheet.

17         Q.  Have we seen that spreadsheet today?

18         A.  I don't know if you have or not.

19         Q.  Have you seen that spreadsheet today?

20         A.  I have -- yes, I absolutely have seen

21  that spreadsheet this morning as of 6:30,

22  7 o'clock.

23         Q.  Where?

24         A.  On my laptop.

25             MR. ARMSTRONG:  That hasn't been

1    THOMAS BUCHANAN - MAY 15, 2018

2    produced.

3              MR. ELLZEY:  I think you have it.

4    The only spreadsheet I've seen, you have, I

5    believe.

6              MR. ARMSTRONG:  3,000 calls logged?

7              MR. ELLZEY:  I don't recall seeing

8    that.

9              THE WITNESS:  Well, may -- may I

10   interject here?  The -- the -- what you have in

11   your possession is not what I have in my

12   possession in that mine is a living document of

13   these phone calls.  Yours is a snapshot in time

14   from this date to this date of the calls.  They

15   -- the spreadsheet that I provided my legal team

16   many months ago does not include everything to

17   date.

18        Q.  This spreadsheet is a spreadsheet

19   that you provided to Mr. Ellzey?

20        A.  Yes, absolutely.

21        Q.  And it contains some -- let's put it

22   this way.  It contains thousands of phone calls?

23        A.  Absolutely.  Yes.

24              MR. ARMSTRONG:  We have not received

25   that.

1    THOMAS BUCHANAN - MAY 15, 2018

2         MR. ELLZEY:  Well, we can discuss

3    that afterwards.  I mean, I don't -- I don't know

4    if you've sent a request for documentation of

5    every call by every company, but to the extent

6    you have, I don't -- I mean, we'll produce it.  I

7    have no problem.  I believe we can.  But I don't

8    remember receiving a spreadsheet with 3,000 calls

9    on it.

10        THE WITNESS:  Yeah, I mean, I -- I

11   would assume -- and I'm guessing here, but I

12   would assume that the spreadsheet that I actually

13   sent probably only had at that point 2,000 calls,

14   not 3.

15        Q.  And these are 2,000 calls from Sirius

16   XM?

17        A.  No, absolutely not.

18        Q.  Okay.  So these are calls from Sirius

19   XM and others?

20        A.  These are phone calls that come in to

21   my home on my landline.  Excluding family,

22   friends, business acquaintances, these are

23   unwanted calls who are selling doors, windows,

24   siding.  These are people spoofing phone numbers.

25   These are people -- these are obscene calls.

1   THOMAS BUCHANAN - MAY 15, 2018

2 They -- they range the spectrum.

3   Q.  Okay.  To the extent that you've

4 brought any lawsuits or small claims petitions

5 against any of these entities, we've already

6 discussed that today?

7   A.  Yes.

8   Q.  Okay.  So the handwriting on this --

9 this document that we were looking at -- and this

10 is Defendant's Exhibit 1.  We were on the page

11 with the four questions.  Remember?

12   A.  Yes.

13   Q.  All right.  Whose handwriting is it

14 -- well, first, that's your signature at the

15 bottom, correct?

16   A.  That is incorrect.  Oh, well, yes,

17 that's my name, and that is my signature at the

18 bottom.

19   Q.  Okay.  The handwriting there that

20 answers the questions, whose handwriting is that?

21   A.  That is the officer that made the

22 phone call to acquire the answers to the

23 questions.

24   Q.  Okay.  And -- and whose handwriting

25 is on the bottom?  Is that the officer?

1      THOMAS BUCHANAN - MAY 15, 2018

2          A.   That's his signature along with his

3      -- I believe that's his badge number.  I'm not

4      sure.

5          Q.   Okay.  Do you know what his name is?

6          A.   Whatever is there.  It looks like

7      Stoneberg.

8          Q.   All right.

9          A.   I mean...

10         Q.   When he -- so he -- he -- your

11     testimony is that he made a call to the number

12     that you asked him to make a call to, and then he

13     filled in the information responding to these

14     questions?

15         A.   He made a call to (972) 437-8642 --

16         Q.   Right.

17         A.   -- and asked those four questions.

18     That's correct.

19         Q.   Okay.  And you were not on that call,

20     correct?

21         A.   No, I was not on the call.

22         Q.   I'm saying you didn't listen in with

23     him?

24         A.   No, I did not.

25         Q.   Okay.

1        THOMAS BUCHANAN - MAY 15, 2018

2             MR. ARMSTRONG:  Ten minutes and we'll

3    take a break?

4             MR. ELLZEY:  Yeah.

5             THE WITNESS:  That sounds good.

6             MR. ARMSTRONG:  You okay?

7             THE WITNESS:  Yeah.

8             (Exhibit 8 was marked.)

9        Q.  Okay.  We've marked as Defendant's

10   Exhibit 8 a -- an email from Tom Buchanan to

11   Tyler Theis.

12            Have you ever seen this --

13       A.  Yes.

14       Q.  -- document before?

15       A.  Yes.

16       Q.  Okay.  You prepared this, correct?

17       A.  That's correct.

18       Q.  And it was in connection with a

19   potential settlement of your dispute with Sirius

20   XM?

21       A.  That is correct.  That was -- Sirius

22   XM contacted me asking if I would be open to a

23   settlement.

24       Q.  Right.  And this is your response to

25   that?

THOMAS BUCHANAN - MAY 15, 2018

1

2      A.   That is correct.

3      Q.   Okay.  The -- the -- you copy someone

4   there D -- or dragon@siriusxm.com.

5           Do you know who that is?

6      A.   No, actually, I -- I don't.

7      Q.   Okay.  Here it's November 11, 2016,

8   correct?

9      A.   That's correct.

10     Q.   And you write, "I've just been

11  informed that I'm entitled to 13,000 per call in

12  damages times 15 calls is 195,000."

13          So as of this date, you are

14  discussing with Sirius 15 calls, correct?

15     A.   That's correct.

16     Q.   All right.  Who informed you that

17  you're entitled to $13,000?

18          MR. ELLZEY:  Objection.  Form.  If

19  the lawyer told you that.

20     A.   That was based on my own research.

21     Q.   So you were informing yourself?

22     A.   Sure.

23     Q.   Okay.  What research did you do?

24     A.   Looking -- researching the -- the

25  laws and the damages that were appropriate based

1          THOMAS BUCHANAN - MAY 15, 2018

2    on the calls.

3          Q.  Okay.  And then you said -- and then

4    your cal -- by your calculation, you are entitled

5    to almost $300,000, correct?

6          A.  That's correct.

7          Q.  But you were looking for a little

8    money to play blackjack with?

9          A.  Sure.

10          Q.  And you were willing to accept

11    $10,000 in damages plus $383.36 in court costs?

12          A.  Yes.

13          Q.  Okay.  What did you mean on page 2

14    where you said if we reached a settlement that

15    you'd be willing to "waive prosecution of

16    individuals be jailed in the county jail for a

17    period of 180 days and fined $2,000"?

18          A.  It's my understanding based on some

19    of the laws that I've reviewed that these

20    individuals making these phone calls can be

21    personally prosecuted, jailed, and fined

22    individually.

23          Q.  So you're willing to give that up for

24    a little money to play blackjack?

25          A.  I'm willing to consider waiving that.

1          THOMAS BUCHANAN - MAY 15, 2018

2     At that time I was.

3          Q.  On the first page, you write, "In my

4     opinion, this case should never come before the

5     Judge."

6          Why did you write that?

7          A.  I clearly felt that I had a very

8     strong case that should have been settled out of

9     court.  There's no need to waste the Court's --

10    Court's time in litigating this.  This matter

11    should be settled out of Court.  Even this case

12    before us today in this meeting, this should be

13    -- this should never come before a Judge.  That's

14    ridiculous.

15         Q.  But no part of your response on

16    settlement included any change to the defendant's

17    business practices, correct?  I thought that's

18    what you were concerned about.

19         A.  I think the assumption is that

20    they'll change their business practices.

21         Q.  But you didn't write that in your

22    response?

23         A.  Did I write that in print, no.  Is

24    that a big deal to me, absolutely.  Sure, the

25    money is important.  But you know what?  The

1          THOMAS BUCHANAN - MAY 15, 2018

2    business practice piece of it is just as

3    important.

4          Q.  And even though it's just as

5    important, you didn't include it in your email?

6          A.  Again, that's an assumption that this

7    will not continue.

8               MR. ARMSTRONG:  All right.  Let's

9    take that break.

10              MR. ELLZEY:  What kind of break are

11   you talking about?  Are we talking about a full

12   lunch, or do you want to keep going?

13              MR. ARMSTRONG:  Yeah, I think we

14   should.

15              MR. ELLZEY:  Okay.

16              MR. ARMSTRONG:  And then that'll

17   allow me to try to be more --

18              MR. ELLZEY:  Yeah, that's fine.

19              MR. ARMSTRONG:  -- efficient and go

20   through this stuff.

21              MR. ELLZEY:  Sure.

22              THE VIDEOGRAPHER:  We are off the

23   record at 11:26 a.m.

24              (Break from 11:26 a.m. to 11:43 a.m.)

25              THE VIDEOGRAPHER:  This is the start

1          THOMAS BUCHANAN - MAY 15, 2018

2      of media labeled No. 3 of the video recorded

3      deposition of Thomas Buchanan.  We are on the

4      record at 11:43 a.m.

5          Q.  (BY MR. ARMSTRONG)  Mr. Buchanan, you

6      mentioned earlier a settlement that you reached

7      with a company where you were paid $3,500 in

8      connection with do-not-call claims?

9          A.  Yes.  Yes.

10         Q.  Okay.  What -- do you remember the

11     name of that company?

12         A.  I don't off the top of my head.

13              MR. ARMSTRONG:  Where is the --

14     excuse me.

15              THE WITNESS:  Sure.

16              MR. ELLZEY:  Lee, can I ask real

17     quick if you're planning on getting into terms of

18     the settlement with the company?  I don't want

19     him to violate any confidentiality clause that

20     will --

21              MR. ARMSTRONG:  We'll take it one

22     step at a time.

23              MR. ELLZEY:  Okay.  All right.

24              MR. ARMSTRONG:  Sure.  We'll go slow.

25              MR. ELLZEY:  All right.

1      THOMAS BUCHANAN - MAY 15, 2018

2      Q.  Just give Jarrett a chance when I ask

3  you a couple of questions about the settlement to

4  just wait, what I'm asking and whether or not you

5  are --

6           THE WITNESS:  Okay.

7           MR. ARMSTRONG:  -- protected.  Okay?

8      A.  All right.

9      Q.  Was the company Americraft Siding &

10  Windows?

11     A.  Yes.

12     Q.  All right.  Did you enter into a

13  written -- a written settlement?

14     A.  Yes.

15     Q.  Does it contain a confidentiality

16  clause?

17     A.  I believe that it does, yes.

18     Q.  Okay.  Does it --

19           MR. ARMSTRONG:  I guess you'll have

20  to instruct or something, but I --

21     Q.  Where is that settlement?  Where is

22  that document?

23     A.  It's filed in the Court.

24     Q.  The settlement agreement itself is

25  filed in court?

1          THOMAS BUCHANAN - MAY 15, 2018

2          A.  Yes.

3              MR. ARMSTRONG:  He may be wrong about

4   that.  So why don't we take a look at it.  I want

5   to ask if you -- I just really want to ask one

6   thing.

7              MR. ELLZEY:  Okay.

8          Q.  As part of the settlement -- and then

9   give Jarrett a chance to --

10         A.  Yeah.

11         Q.  -- think about it.

12             As part of the settlement, did it

13  include promises by the company to change its

14  business practices?

15             MR. ELLZEY:  I'm going to object for

16  the record to the extent that there's a

17  confidentiality clause in your settlement

18  agreement that you not violate it by discussing

19  the terms of the settlement agreement.

20         A.  Okay.  And my response is I really

21  don't feel comfortable answering the question

22  based on the agreement that I signed.

23         Q.  All right.  Well, we'll -- we'll take

24  that up privately then.  I'll leave the agreement

25  alone.  Prior to reaching the agreement, did you

1        THOMAS BUCHANAN - MAY 15, 2018

2    insist that one of the conditions be that this

3    company change its dialing practices?

4        A.  I made it quite clear that I wanted

5    them to change the way they do business, I think,

6    would be a good way to characterize it.

7             MR. ARMSTRONG:  Okay.  All right.

8    Well, we'll just have to -- we'll -- we'll

9    discuss the agreement offline.

10             MR. ELLZEY:  That's fine.

11        Q.  (BY MR. ARMSTRONG) Okay.  Have you

12    ever answered a call on your landline and asked

13    the caller not to keep calling?

14        A.  Absolutely.  Numerous times.

15        Q.  You never did that with Sirius XM

16    because you never got to the phone in time,

17    right?

18        A.  I never talked to a human being from

19    Sirius.  That's correct.

20        Q.  Okay.  Have you ever sent -- other

21    than the letter that you claim you sent in this

22    case to Sirius XM requesting that they not call

23    you any longer, have you ever sent a similar

24    letter to any other company?

25        A.  Absolutely.

1          THOMAS BUCHANAN - MAY 15, 2018

2          Q.  Did you turn those letters over to

3   your counsel?

4          A.  That's a good question.  I -- I can't

5   answer that.

6          Q.  Okay.

7          A.  I don't know if I did or not.

8          Q.  Okay.  How many times have you done

9   that?

10         A.  Several.

11         Q.  Several as in three?  As in five?  As

12  in two?

13         A.  Under ten.  Other than that, I -- I

14  don't know.

15         Q.  You kept them, though, in that file

16  you mentioned, right?

17         A.  Yes.  I would say that I've either

18  got them -- yeah.

19         Q.  Okay.  You -- you -- do you intend to

20  be the class representative?

21         A.  I hope to be, yes, absolutely.

22         Q.  And can you tell me what you

23  understand your responsibilities as class

24  representative to be?

25             MR. ELLZEY:  Objection.  Form.

1        THOMAS BUCHANAN - MAY 15, 2018

2        Q.  Do you have any understanding as to

3   what you're supposed to do as class

4   representative?

5        A.  I'm to be the primary litigant.

6        Q.  And what does that mean?

7        A.  I am to represent the other people in

8   the class that they've done this to.

9        Q.  Anything else?

10          MR. ELLZEY:  Objection.  Form.

11       A.  Nothing comes to mind at the moment.

12       Q.  I noticed on your -- you -- I have a

13   resumé -- what appears to be a resumé.  It's a

14   multi-page document.  I'm going to show it to

15   you.

16       A.  Sure.

17          (Exhibit 9 was marked.)

18          (Sotto voce discussion.)

19       Q.  Okay.  So we've marked as Defendant's

20   Exhibit 9 a multi-page document.  It appears to

21   be a resumé of sorts for Tom Buchanan bearing

22   Bates Buchanan 10 through 18.

23          Mr. Buchanan, this is a document that

24   you prepared?

25       A.  Yes.

1          THOMAS BUCHANAN - MAY 15, 2018

2          Q.  Okay.  And am I right?  Is it

3     essentially a resumé?

4          A.  Yes.

5          Q.  And it contains the various

6     employment that you've been engaged in throughout

7     your career?

8          A.  That's correct.

9          Q.  And is it -- without me asking you

10    about every single one of the jobs, is it -- is

11    it accurate as far as know?

12         A.  To the best of my knowledge, it's

13    accurate, yes.

14         Q.  Okay.  I see references in here at

15    times to customer service and call centers.

16              Did you ever make phone calls to

17    consumers?

18         A.  Oh, absolutely not, no.

19         Q.  Okay.  Did you ever work on

20    technology that allowed contact to be made to

21    consumers without human intervention?

22         A.  No.

23         Q.  Okay.  Do you see page Buchanan 12?

24         A.  Yes.

25         Q.  There's a reference to Daily Market

1          THOMAS BUCHANAN - MAY 15, 2018

2    Data?

3          A.  Yes.

4          Q.  And it says, among other things, that

5    you undertook doing -- to -- you reformatted data

6    and "had the system automatically email each data

7    file using STMP to a subscriber base without

8    human intervention."

9               Do you see that?

10         A.  Yes.

11         Q.  So is it true -- did you -- were you

12   involved in doing that?

13         A.  Yes.

14         Q.  Okay.  What exactly did you do?

15         A.  That is a process by which I used

16   task manager or task scheduler inside Windows to

17   send raw data files to one or more individuals.

18         Q.  These individuals were subscribers,

19   right?

20         A.  No, absolutely not.

21         Q.  Well, you write here "to a subscriber

22   base."

23         A.  Well, that's just my own terminology.

24         Q.  So who were these individuals?

25         A.  Was --

1          THOMAS BUCHANAN - MAY 15, 2018

2          Q.   What relation were they to the

3     company Daily Market?

4          A.   They are just friends who wish to

5     receive a data file.

6          Q.   They're friends of whose?

7          A.   Myself.

8          Q.   Okay.  Did you -- what is Daily

9     Market Data?

10         A.   It is a -- it is a website that I

11    created that -- that basically provides stock

12    data, formatted stock data.

13         Q.   Okay.  So it provides formatted stock

14    data.  And how does an individual receive that

15    stock data.  How did they?

16         A.   Well --

17         Q.   Well, let me withdraw the question.

18    It says stocks data, if you're being accurate

19    here, was sent automatically to individuals

20    without human intervention.  Right?

21         A.   That's correct.

22         Q.   And did you receive written consent

23    from all the individuals to receive this data?

24         A.   I received verbal consent, yes.

25         Q.   Just listen to my question.

THOMAS BUCHANAN - MAY 15, 2018

1

2          Did you receive written consent?

3     A.  No.

4     Q.  Okay.  How -- how -- you reference a

5   subscriber base.  How many individuals are we

6   talking about?

7     A.  Oh, my.  Two, three.

8     Q.  Two or three people?

9     A.  Yes.  I mean, we're not talk -- this

10  -- this was -- this was programmed by me

11  primarily for me, and several of my friends found

12  out that I was interested in this project, doing

13  this project, and they said would you share some

14  formatted data files.  And I said, sure, I'll

15  program that in.  This is not something that I'm

16  actively marketing nationwide, i.e., as in Sirius

17  XM and I've created products and I'm out selling

18  them and yada, yada, yada.

19    Q.  Have you ever created products or

20  services and sold them to the public?

21    A.  No.

22    Q.  I see there's various -- throughout

23  your resumé, there's various references to

24  technology, whether it's Windows --

25    A.  Yes.

1                    THOMAS BUCHANAN - MAY 15, 2018

2          Q.  -- and so you've used Microsoft

3     Office, right?

4          A.  Yes.

5          Q.  Okay.  And that came -- at some point

6     when you were using it, came with a trial, did it

7     not?

8          A.  Generally, no.

9          Q.  Have you ever used -- if we were to

10    go back and look through all these records, would

11    we find that you had ever used a free trial of

12    any software?

13         A.  I don't do trials.  My overall

14    response would be no.  If I'm interested in a

15    project or if I have a problem that needs a

16    solution, I generally go on the internet, search

17    out the software that I feel will solve the

18    problem that I'm trying to solve, go look at the

19    instructional tutorials to determine does it --

20    is it a good fit, and if it is, I go buy it.

21         Q.  Even if -- even if it were offered as

22    a trial so you could better gauge whether it's a

23    good fit, you still would not sign up for the

24    trial; is that correct?

25         A.  I generally do not, no.

THOMAS BUCHANAN - MAY 15, 2018

1

2      Q.  Can you think of -- and you say

3  "generally."  Can you think of any instance when

4  you indeed did sign up for a free trial of any

5  service?

6      A.  Nothing comes to mind.  The -- the

7  only possible thing that might come to mind is

8  Adobe, but I don't believe that's a subscription.

9  I think that's a free -- that's always been free.

10     Q.  Okay.  So Adobe, that is a software

11 that allows viewing of PDFs?

12     A.  Yes.

13     Q.  And you understand that even if it's

14 free that it comes with certain terms and

15 conditions?

16     A.  Sure.

17     Q.  And how would you find out what the

18 terms and conditions are?

19     A.  You read them.

20     Q.  Okay.  And have you done that at

21 times?

22     A.  Oh, absolutely.

23     Q.  And do you believe that at any point

24 in your career you've had an existing business

25 relationship with Adobe?

1     THOMAS BUCHANAN - MAY 15, 2018

2          MR. ELLZEY:  Objection.  Form.

3     A.  I would have to answer no.

4     Q.  Okay.  So even though you're using

5  their service and you understand there are terms

6  and conditions to that service, your answer is

7  that, no, you would not consider yourself to have

8  an existing business relationship with that

9  service, correct?

10         MR. ELLZEY:  Objection.  Form.

11    A.  That's correct.  I would not consider

12 myself to have a business relationship with

13 Microsoft, but I use their software daily.

14    Q.  But just to close it out, I was

15 asking you about Adobe, correct?  Same answer?

16    A.  Same answer.

17    Q.  Okay.

18         MR. ARMSTRONG:  Okay.  Let's mark

19 this.

20         (Exhibit 10 was marked.)

21         MR. ARMSTRONG:  What is this, Kim?

22         THE REPORTER:  10.

23    Q.  Okay.  All right.  We've marked as

24 Defendant's Exhibit 10, owner's manual to a 2011

25 Odyssey.  And this was produced by you,

1      THOMAS BUCHANAN - MAY 15, 2018

2    Mr. Buchanan.  Oh, this is important.  This is

3    not the entire owner's manual.  It is a very

4    lengthy document, so these are portions.  I'm not

5    going to have many questions about it, but I just

6    wanted to make sure that --

7         A.  Okay.

8         Q.  -- you understood that.  Okay?

9              THE WITNESS:  Looks like a whole --

10             MR. ELLZEY:  Do you know what's

11   missing?

12             THE WITNESS:  Mainly its main --

13             MS. WAKS:  I mean, it was a 700-page

14   document, sections that really didn't -- to other

15   parts of the car.

16             MR. ELLZEY:  Okay.

17        Q.  Okay.  So where did -- so this came

18   from your files, Mr. Buchanan.  Okay.  You

19   produced this to us in -- in its full form, but

20   we just to save trees --

21        A.  Yeah.

22        Q.  Okay?

23        A.  Okay.

24        Q.  Where did you keep -- before you

25   produced this to us, where did you keep the

1          THOMAS BUCHANAN - MAY 15, 2018

2    owner's manual for the van?

3          A.  It's kept in the vehicle, in the

4    glove box --

5          Q.  I see.

6          A.  -- I believe.

7          Q.  Okay.  And I noticed that various

8    sections --

9              (Sotto voce discussion. )

10             MR. ARMSTRONG:  One second.

11         Q.  Okay.  Do you know if you ever -- I

12   just have one question.  Do you know if you ever

13   read any sections in the owner's manual?

14         A.  Oh, I'm sure we have, yes.

15         Q.  Okay.  Well, so can just help me

16   understand you better?  Is it -- are you a

17   cover-to-cover person?  You buy something, you

18   get an owner's manual, and then do you diligently

19   read?

20         A.  Definitely not.

21         Q.  Is it more as you have an issue with

22   respect to certain something, then you'll go

23   searching for that?

24         A.  If I have a question about a feature,

25   I will go searching for it as to how to use it or

1       THOMAS BUCHANAN - MAY 15, 2018

2   what it does.

3       Q.  Okay.  So when you -- when you hit

4   the XM -- withdrawn.

5       Are you aware that there's a section

6   in here on satellite radio?

7       A.  Yes.

8       Q.  Okay.  And did you -- when is the

9   first time you saw that?

10      A.  When it was brought to my attention.

11      Q.  What do you mean?

12      A.  That's all -- that's the only way I

13  can answer that.  I don't recall at what time

14  period or who brought it to my attention other

15  than I'm sure I saw the button on the dash and --

16  or my wife did, and we looked at each other and

17  said, What's that?  Let's go get the owner's

18  manual.

19      Q.  Okay.  And you testified earlier that

20  it didn't work then when you -- the first time

21  you pushed the XM, and you said it still doesn't

22  work.  Do you recall that?

23      A.  It's my -- to -- to the best of my

24  knowledge, it's never worked, it doesn't

25  currently work, and I had no intention of dialing

1             THOMAS BUCHANAN - MAY 15, 2018

2    the 800 number to request that it be configured.

3        Q.  Yeah, you probably want to call your

4    lawyer before you dial that 800 number.

5             MR. ELLZEY:  Please do.

6             THE WITNESS:  It will never happen.

7             MR. ELLZEY:  We can arrange --

8             MR. ARMSTRONG:  I'm sure -- I'm sure

9    it'll never happen.  I don't know much, but that

10   I know.

11            MR. ELLZEY:  It doesn't sound like

12   he's going to call it anyway.

13       Q.  Okay.  So -- so -- so am I right

14   then, you did try other times other than that one

15   time to press the button to see what happens?

16       A.  To the best -- to the best of my

17   recollection, I pushed it once.

18       Q.  Oh.

19       A.  Okay.

20       Q.  Okay.  That's your recollection?

21       A.  That's my recollection.

22       Q.  Okay.  And then when you -- to the

23   best of your recollection, when you consulted the

24   owner's manual about it, what do you remember?

25       A.  Pretty much the owner's manual says

1        THOMAS BUCHANAN - MAY 15, 2018

2   it's satellite radio.  If you want it configured,

3   dial this 800 number and give them some unique ID

4   number, and they'll flip a switch or turn it on,

5   and you can start playing the radio using

6   satellite radio.

7        Q.  Okay.  And that was of no interest to

8   you?

9        A.  Absolutely not.

10        Q.  Okay.  You can put that aside.

11        MR. ARMSTRONG:  This should be our

12   last hopefully for today.  And it's the same for

13   this, right?  This is not the full manual, or it

14   is.

15        MS. WAKS:  It is.

16        MR. ARMSTRONG:  Oh, it is.  Okay.

17        (Exhibit 11 was marked.)

18        Q.  So Defendant's Exhibit 11, which we

19   have marked, is a manual for a Honda 2011 Odyssey

20   Touring and Touring Elite, which is referred to

21   on the second page as a technology reference

22   guide.  And you've seen this document before,

23   Mr. Buchanan, right?

24        A.  Yes.

25        Q.  It's a document you produced to us.

1       THOMAS BUCHANAN - MAY 15, 2018

2   It has Bates stamps on the bottom Buchanan 312

3   through 353.  I noticed that -- and where --

4   where was this document kept before you produced

5   it to us or to your lawyer?

6       A.  Inside the van.  It's my

7   understanding she keeps it in the glove box, but

8   she may keep it somewhere else.

9       Q.  Okay.  I see that -- that -- like if

10  you'll look at page 314, so it's just three pages

11  in.

12      A.  Okay.

13      Q.  There look to be Post-Its on the

14  right-hand side of the document.

15          Do you see those little flags that

16  stick out?

17      A.  Yes.

18      Q.  Okay.  Am I right that that's --

19  represents you or your wife flagging certain

20  parts of this manual?  Is that fair?

21      A.  I don't recall if she did it or if it

22  was that way when we purchased the vehicle.  I

23  know I did not -- I -- to the best of my

24  recollection, I don't recall tabbing any -- any

25  pages in the documents.

1        THOMAS BUCHANAN - MAY 15, 2018

2        Q.   Okay.  Do you -- do you remember at

3   all looking at satellite radio literature within

4   this document, same way you described for the

5   owner's manual?

6        A.   I actually don't have a recollection

7   of looking in here for that.  So I'm not even

8   sure that this manual contains that.  And

9   actually in flipping through the pages, I don't

10  think there's -- I would have to say I don't

11  believe that this document even covers satellite

12  radio on any of the pages.  Now, I could be

13  wrong, but...

14       Q.   Yeah.  On page -- we don't need to --

15  page 19, there's a reference to XM and various

16  commands.  But if you didn't see it, you didn't

17  tab it, then I don't need to ask you about it.

18       A.   Page 9 -- 319?

19       Q.   No, I'm sorry, I switched it up on

20  you.  It's -- 332 is the Bates stamp.

21       A.   Interesting.  My response to your

22  question is I've -- I've not seen this before

23  today.

24       Q.   Right.  Okay.

25            MR. ARMSTRONG:  Good.  Okay.  That's

```
 1              THOMAS BUCHANAN - MAY 15, 2018
 2    all the questions that I have for you,
 3    Mr. Buchanan.  Thank you very much.
 4              MR. ELLZEY:  I just have a couple of
 5    follow-ups.
 6                     EXAMINATION
 7    BY MR. ELLZEY:
 8         Q.  Mr. Buchanan, we've met before,
 9    correct?
10         A.  Yes.
11         Q.  And is it true that I'm your
12    attorney?
13         A.  Yes.
14         Q.  Do you have other attorneys?
15         A.  Yes.
16         Q.  With respect to this case?
17         A.  With respect to our team, yes.
18         Q.  Correct.  Has my office regularly
19    communicated with you about this case?
20         A.  Absolutely.
21         Q.  Have we communicated with you about
22    the developments in the case?
23         A.  Yes.
24         Q.  Do you understand what the discovery
25    process is?
```

1          THOMAS BUCHANAN - MAY 15, 2018

2          A.  Yes.

3          Q.  Is taking a deposition part of that

4    process?

5          A.  Yes.

6          Q.  You were shown some interrogatories

7    by Mr. Armstrong earlier.  Do you recall that?

8          A.  Yes.

9          Q.  Did my office and did I personally

10   discuss those interrogatories with you?

11         A.  You keep me abreast and communicate

12   very well with what's going on and the status.

13         Q.  Well, I heard you say something

14   interesting earlier, and now it's -- I believe

15   your testimony was you didn't want to know about

16   what the litigation team was doing; you just

17   wanted to hear from me.  Do you recall --

18         A.  Yes.

19         Q.  -- that?

20             But that didn't mean that you didn't

21   want to be involved in the process?

22         A.  Oh --

23             MR. ARMSTRONG:  Object to the form.

24   Leading.

25             You can answer.

1       THOMAS BUCHANAN - MAY 15, 2018

2           A.  No, that -- that absolutely does not

3   mean I want to -- I do not want to be involved in

4   the process.  It means I want a -- one individual

5   to be my lead attorney that will coordinate all

6   of the other teams and legal firms that are

7   associated with this, and I communicate through

8   you to them and vice versa.

9           Q.  Did you authorize my firm to pick the

10  law firms that were going to be involved in the

11  case?

12          A.  Absolutely.

13          Q.  Did we clear it with you before --

14          A.  Sure.

15          Q.  -- we decided retain those law firms?

16          A.  Sure.

17          Q.  Do you understand that this case

18  could go to trial?

19          A.  Yes.

20          Q.  Do you understand that a case like

21  this could take two weeks or more to try?

22          A.  I don't care if this takes two months

23  to try, that's --

24          Q.  Are you willing -- I'm sorry.  Are

25  you willing to participate in trial as the lead

1          THOMAS BUCHANAN - MAY 15, 2018

2     plaintiff if this case goes to trial?

3          A.   Absolutely.

4              MR. ELLZEY:  Nothing further.

5              MR. ARMSTRONG:  Thank you.

6              THE VIDEOGRAPHER:  We are off the

7     record at 12:09 p.m.

8              (Time noted - 12:08 p.m.)

9

10

11

12

13

14

15                    _____

16                    THOMAS BUCHANAN

17

18    Subscribed and sworn to before me this _____

19    day of _____, 20____.

20

21

22

23

24

25

1

2                    C E R T I F I C A T E

3

4          I, Kim A. McCann, RMR, CRR, CSR in and

5    for the State of Texas, do hereby certify:

6          That THOMAS BUCHANAN, the witness whose

7    deposition is hereinbefore set forth, was duly

8    sworn by me and that such deposition is a true

9    record of the testimony given by such witness;

10         That pursuant to FRCP Rule 30,

11   signature of the witness was not requested by the

12   witness or other party before the conclusion of

13   the deposition;

14         I further certify that I am not

15   related to any of the parties to this action by

16   blood or marriage; and that I am in no way

17   interested in the outcome of this matter.

18         IN WITNESS WHEREOF, I have hereunto

19   set my hand this May 15, 2018.

20

21   _____

22      Kim A. McCann, RMR, CRR, CSR

23

24

25

1

2    ERRATA SHEET FOR THE TRANSCRIPT OF:

3    Case Name:   THOMAS BUCHANAN v. SIRIUS XM RADIO

4    Dep. Date:  May 15, 2018

5    Deponent:   THOMAS BUCHANAN

6    Pg. Ln. Now Reads    Should Read     Reason

7    ___ ___ _____  _____  _____

8    ___ ___ _____  _____  _____

9    ___ ___ _____  _____  _____

10   ___ ___ _____  _____  _____

11   ___ ___ _____  _____  _____

12   ___ ___ _____  _____  _____

13   ___ ___ _____  _____  _____

14   ___ ___ _____  _____  _____

15   ___ ___ _____  _____  _____

16   ___ ___ _____  _____  _____

17   ___ ___ _____  _____  _____

18                       _____

19                       Signature of Deponent

20

21   SUBSCRIBED AND SWORN BEFORE ME

22   THIS _____ DAY OF _____, 20_____.

23

24   _____

25   (Notary Public) MY COMMISSION EXPIRES: _____