# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

|  |  |
|---|---|
| **THOMAS BUCHANAN, on behalf of himself and all others similarly situated,**<br><br>**Plaintiff,**<br><br>v.<br><br>**SIRIUS XM RADIO INC.,**<br><br>**Defendant.** | **Civil Action No. 3:17-cv-00728-D** |

## DEFENDANT SIRIUS XM RADIO INC.'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Albert J. Rota
  Texas Bar No. 24056233
Sidney S. McClung
  Texas Bar No. 24083880
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201
Tel: (214) 969-3698
Fax: (214) 969-5100
Email: ajrota@jonesday.com
Email: smcclung@jonesday.com

Thomas Demitrack (admitted *pro hac vice*)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114-1190
Tel: (216) 586-3939
Fax: (216) 579-0212
Email: tdemitrack@jonesday.com

Lee A. Armstrong (admitted *pro hac vice*)
Allison L. Waks (admitted *pro hac vice*)
JONES DAY
250 Vesey Street
New York, New York
Tel: (212) 326-3939
Fax: (212) 755-7306
Email: laarmstrong@jonesday.com
Email: awaks@jonesday.com

*Counsel for Defendant Sirius XM Radio Inc.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................................ii

INTRODUCTION ...............................................................................................................1

BACKGROUND .................................................................................................................2

    A.    SiriusXM provides trial subscriptions to its satellite radio programming ...................2

    B.    SiriusXM's presence varies during the vehicle-buying and -leasing process...............2

    C.    SiriusXM maintains contact with consumers after purchase or lease...........................8

    D.    SiriusXM calls trial subscribers ........................................................................9

    E.    Buchanan sues SiriusXM ................................................................................ 10

ARGUMENT .................................................................................................................... 11

I.    Buchanan's DNC Registry class (Count I) fails Rule 23's rigorous predominance and
superiority requirements............................................................................................ 11

    A.    Class representatives must prove predominance and superiority............................... 12

    B.    The FCC has broadly defined what counts as an EBR................................................. 14

    C.    Assessing whether SiriusXM had EBRs with class members would require
millions of mini-trials ........................................................................................ 16

    D.    Buchanan's counterarguments lack merit ........................................................... 21

II.    The Internal-DNC class (Count II) shouldn't be certified either ............................................ 23

    A.    Individual questions predominate ...................................................................... 23

    B.    Buchanan cannot establish typicality or adequacy under Rule 23(a)......................... 24

III.    Standing questions likewise defeat predominance for both proposed classes ....................... 25

CONCLUSION................................................................................................................. 25

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Allison* v. *Citgo Petroleum Corp.*,
    151 F.3d 402 (5th Cir. 1998)........................................................................................14

*Amchem Prods., Inc.* v. *Windsor*,
    521 U.S. 591 (1997)............................................................................................. 12, 21

*Animal Sci. Prods., Inc.* v. *Hebei Welcome Pharm. Co.*,
    138 S. Ct. 1865 (2018) ........................................................................................ 22, 23

*Beck* v. *Maximus, Inc.*,
    457 F.3d 291 (3d Cir. 2006) ...................................................................................24

*Bell Atl. Corp.* v. *AT&T Corp.*,
    339 F.3d 294 (5th Cir. 2003)...................................................................................25

*Castano* v. *Am. Tobacco Co.*,
    84 F.3d 734 (5th Cir. 1996) ....................................................................................20

*CE Design Ltd.* v. *King Architectural Metals, Inc.*,
    637 F.3d 721 (7th Cir. 2011)...................................................................................24

*CE Design, Ltd.* v. *Prism Bus. Media, Inc.*,
    606 F.3d 443 (7th Cir. 2010)...................................................................................14

*Comcast Corp.* v. *Behrend*,
    569 U.S. 27 (2013)............................................................................................. 18, 21

*Connelly* v. *Hilton Grand Vacations Co.*,
    294 F.R.D. 574 (S.D. Cal. 2013) .............................................................................13

*Forman* v. *Data Transfer, Inc.*
    164 F.R.D. 400 (E.D. Pa. 1995) ..............................................................................13

*Gene & Gene LLC* v. *BioPay LLC*,
    541 F.3d 318 (5th Cir. 2008)............................................................................*passim*

*Hamilton* v. *Spurling*,
    No. 11-0102, 2013 WL 1164336 (S.D. Ohio Mar. 20, 2013)...........................................15

*Hancock* v. *Chi. Title Ins. Co.*,
    263 F.R.D. 383 (N.D. Tex. 2009) ..............................................................12, 13, 21, 22

*Hooker* v. *Sirius XM Radio, Inc.*,
    No. 13-3, 2014 WL 12597593 (E.D. Va. June 5, 2014).....................................................22

*In re Joint Pet. Filed by Dish Network, LLC*,
    28 F.C.C. Rcd. 6574 (2013) ....................................................................................16

*In re Rules & Regs. Implementing the TCPA*,
    7 FCC Rcd. 8752 (1992)........................................................................................14

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*In re Rules & Regs. Implementing the TCPA* (*2003 TCPA Order*),
    18 FCC Rcd. 14,014 (2003) ...........................................................................15, 16, 18

*In re TWL Corp.*,
    712 F.3d 886 (5th Cir. 2013).....................................................................................14

*Kase* v. *Salomon Smith Barney, Inc.*,
    218 F.R.D. 149 (S.D. Tex. 2003) ...............................................................................20

*Kenro, Inc.* v. *Fax Daily, Inc.*,
    962 F. Supp. 1162 (S.D. Ind. 1997) ...........................................................................13

*Levitt* v. *Fax.com*,
    No. 05-949, 2007 WL 3169078 (D. Md. May 25, 2007)..............................................13

*London* v. *Wal-Mart Stores, Inc.*,
    340 F.3d 1246 (11th Cir. 2003) ................................................................................21

*Mais* v. *Gulf Coast Collection Bureau, Inc.*,
    768 F.3d 1110 (11th Cir. 2014) ................................................................................16

*Martin* v. *Comcast Corp.*,
    No. 12-6421, 2013 WL 6229934 (N.D. Ill. Nov. 26, 2013) .....................................23, 24

*Meyer* v. *Bebe Stores, Inc.*,
    No. 14-0267, 2016 WL 8933624 (N.D. Cal. Aug. 22, 2016)........................................13

*Morris* v. *Copart*,
    No. 15-724, 2016 WL 6608874 (E.D. Tex. Nov. 9, 2016)...........................................15

*Newhart* v. *Quicken Loans Inc.*,
    No. 15-81250, 2016 WL 7118998 (S.D. Fla. Oct. 12, 2016)........................................13

*Nigro* v. *Mercantile Adjustment Bureau, LLC*,
    769 F.3d 804 (2d Cir. 2014) ....................................................................................14

*Sandusky Wellness Ctr., LLC* v. *ASD Specialty Healthcare, Inc.*,
    863 F.3d 460 (6th Cir. 2017)....................................................................................13

*Savino* v. *Comp. Credit, Inc.*,
    164 F.3d 81 (2d Cir. 1998) ...................................................................................24, 25

*Simmons* v. *Charter Commc'ns, Inc.*,
    222 F. Supp. 3d 121 (D. Conn. 2016) .....................................................................23, 24

*Spokeo, Inc.* v. *Robins*,
    136 S. Ct. 1540 (2016) .............................................................................................25

*Wal–Mart Stores, Inc.* v. *Dukes*,
    564 U.S. 338 (2011)..................................................................................................12

*Zelma* v. *Conway*,
    No. 12-0256, 2013 WL 6498548 (D.N.J. Dec. 11, 2013) .........................................15, 16

## TABLE OF AUTHORITIES
(continued)

Page(s)

**STATUTES, REGULATIONS, AND RULES**

15 U.S.C. § 1232 ................................................................................................................................. 3

47 U.S.C. § 227 ..................................................................................................................... 14, 20, 22

47 C.F.R. § 64.1200 .................................................................................................................. *passim*

Fed. R. Civ. P. 23 ..................................................................................................................... *passim*

**OTHER AUTHORITIES**

H.R. Rep. No. 102-317 (1991) ........................................................................................................ 16

## INTRODUCTION

Plaintiff Thomas Buchanan seeks to certify one of the largest classes in history—comprising millions of people on the nationwide Do-Not-Call (DNC) Registry who had trial subscriptions to SiriusXM's satellite radio programming, usually through purchase or lease of a vehicle. Buchanan claims that SiriusXM's calls to those trial subscribers violated the Telephone Consumer Protection Act, and that the putative class is entitled to $1,500 per call. In other words, Buchanan seeks hundreds of billions of dollars based on hundreds of millions of calls to millions of trial subscribers during the relevant time period. Under the Federal Communications Commission's regulations, however, a business like SiriusXM may call someone on the DNC Registry with whom it has an established business relationship (EBR). And an individual forms an EBR with a business not only when she "purchase[s] or transact[s] with the entity," but also when she voluntarily communicates, "with or without an exchange of consideration," by making an "inquiry or application regarding [the business's] products or services." 47 C.F.R. § 64.1200(f)(5). Accordingly, determining whether a business caller has an EBR with a particular consumer demands a fact-intensive inquiry into, among other things, whether the consumer purchased from or transacted with the business or asked questions about its services.

Here, whether SiriusXM had an EBR with any given trial subscriber (or whether it could rely on a vehicle dealership's EBR with that subscriber under a related regulation) turns on a host of variables: SiriusXM's relationship with the dealer, what the consumer saw at the dealership when buying or leasing the vehicle, what the salesperson said to her during that process, what she said to the salesperson, what she understood about her trial subscription, what she said to SiriusXM during later phone calls, and so on. But Buchanan never bothers to recite the EBR regulation, let alone explain how it can be applied, based on generalized, classwide evidence he does not and cannot muster, to hundreds of millions of calls to millions of people in widely varying circumstances. It can't be done, even assuming Buchanan can offer individualized evidence of his own unique circumstances. Further, such a massive class action is neither necessary nor desirable where there is little evidence of consumer concern, and any uniquely situated consumers may take advantage of individual remedies, such as filing a

small-claims complaint like Buchanan initially did here. The class cannot be certified.

Buchanan's internal do-not-call class fails too. Individualized inquiries about the reasonable-ness of the time it took to honor opt-out requests would swamp any common questions. Moreover, Buchanan's uniquely weak claim makes him an inadequate and atypical class representative.

## BACKGROUND

Buchanan's proposed class action challenges phone calls made by vendors on behalf of Sirius-usXM, which provides satellite radio service and offers vehicle buyers and lessees (among others) trial subscriptions to its programming. A.12. The goal of the some 215 million calls SiriusXM made to landline phones during the relevant time period was to ask about those subscribers' experiences with SiriusXM's services and to encourage them to convert to paid subscriptions. *See* A.18.

### A.      SiriusXM provides trial subscriptions to its satellite radio programming

SiriusXM has relationships with every major vehicle manufacturer (OEM) that provide for the installation of SiriusXM radios in approximately three quarters of the new vehicles sold or leased in the United States. A.30. Although the radios allow vehicles to receive a satellite signal, access to pro-gramming requires a subscription to SiriusXM's service. Through relationships with vehicle manufac-turers, and many dealerships of new, certified preowned, and used vehicles, SiriusXM offers trial sub-scriptions to vehicle buyers and lessees, as well as to drivers who service their vehicles at dealerships. A.12–13, 30. SiriusXM also offers trial subscriptions to drivers who service their vehicles at independ-ent service facilities, *id.*, and to consumers who visit SiriusXM's website, A.13. Those trial subscrip-tions last anywhere from several months to a year or more. A.30. A trial subscriber can extend her access by converting to a paid subscription. *Id.* SiriusXM works with vehicle manufacturers, dealer-ships, and directly with buyers and lessees to ensure that buyers and lessees know that SiriusXM's radio services are a feature of the vehicles they purchase or lease. *See generally* A.31–35.

### B.      SiriusXM's presence varies during the vehicle-buying and -leasing process

**1. Relationships with OEMs.** SiriusXM works with OEMs to install satellite radios, place SiriusXM buttons on dashboards, and encourage OEMs to ensure that consumers know SiriusXM's

equipment and services are part of the new and certified preowned vehicles they purchase or lease. Indeed, both Toyota and Honda agree to advise purchasers and lessees that "they are subscribers of XM and have an existing business relationship with XM." A.32, 56, 79. OEMs, in turn, communicate SiriusXM's expectations to dealers. But the arrangements vary.

**Sales materials.** OEMs agree, among other things, to include informational, sales and marketing materials about SiriusXM in their vehicles. *E.g.*, A.31-33, 55, 78, 108–09, 166-67, 191–92, 252–54, 297–98, 355–56. Those materials include SiriusXM brochures (often placed in glove boxes), as well as SiriusXM hang tags, window stickers, or other SiriusXM-branded materials. A.32–35, 604–14. Those brochures describe SiriusXM's trial subscription, explain how to access the service, and provide information about how the consumer can refresh the service, learn more about it online, and contact SiriusXM. *Id.* The brochures also describe "[h]ow [SiriusXM] [c]ommunicate[s]": SiriusXM "may get your contact information from your dealer, automaker or other third party, and contact you by mail, phone or email to discuss subscription options." A.33, 604, 607, 610, 613. OEMs also communicate SiriusXM's service as a vehicle component or feature on their federally required "Monroney" labels.[1] A.34–35, 554–62. And most, if not all, SiriusXM-equipped vehicles describe the SiriusXM equipment or services in the owner's manual. A.33–34, 380–552. OEMs further agree to communicate SiriusXM's service in their marketing efforts, both directly to consumers and also to dealers. A.31–35. Toyota and Honda, for instance, agree to "███████████████████████████████████████ ███████████████████████████" services. A.32, 55, 78.

**Expectations for dealers.** OEMs communicate SiriusXM's expectation that dealers will explain SiriusXM's service as a vehicle feature to consumers, and many dealers explain that SiriusXM will contact consumers. A.31–33, 1228, 1229, 1232, 1236, 1237, 1254, 1274. OEMs agree to provide dealers with SiriusXM training literature on presetting channels for consumers and how consumers can convert to paid subscriptions. A.31, 109, 167, 191, 253, 297, 356.

---

[1] 15 U.S.C. § 1232; *see, e.g.*, A.554 ("SiriusXM® All Access service (w/ 3-month trial subscription)"); A.558 ("Infotainment System Featuring: . . . 1 year Sirius XM® Satellite Radio").

To that end, OEMs often provide dealerships with checklists they expect dealers to use when delivering vehicles to purchasers or lessees. A.35–36, 564–602. Those checklists usually note that the salesperson should explain SiriusXM's service as a vehicle feature. But the forms vary from dealer to dealer and vehicle to vehicle. The forms for the 2017 Chevrolet Corvette and 2018 Chevrolet Malibu, for instance, instruct the salesperson to "[p]resent all glovebox material including … XM Radio … literature" and to "[e]xplain key features of the audio and infotainment systems," including "XM." A.568–69. Toyota's form, similarly, asks the salesperson to indicate that she has "[d]emonstrated and explained SiriusXM Satellite Radio™," A.573, and a 2009 Jeep Wrangler form lists "uconnect studios featuring SIRIUS® Satellite Radio" as a "feature[] that should be pointed out/explained/demonstrated during vehicle delivery." A.566. Yet another group of forms provides even greater exposure to SiriusXM by asking the salesperson and buyer or lessee to review SiriusXM and then set favorite channels.[2] And still other dealerships use electronic checklists that require the consumer to click through information, with an option to click to "Learn More" about SiriusXM radio.[3] Still other checklists combine some of those features, leaving discretion to the salesperson;[4] some list satellite radio as a feature the salesperson should review with the consumer, but without any specific instructions.[5] But even where dealers don't use checklists or use checklists that don't specifically mention SiriusXM, they still usually communicate with consumers about the service. *E.g.*, A.1229, 1254–55. Finally, SiriusXM

██████████████████████████████████████████████████████████

██████ , *e.g.*, A.46, 167, 253, 297, ██████████████████████████████

---

[2] *E.g.*, A.602 (Honda) ("RADIO PRESETS" box instructs salesperson to "[s]how customer how to store a station," lists steps, and provides spaces with lines for customer or salesperson to write "SXM" preset stations); A.571 (Land Rover) (consumer to "confirm that the items above have been fully explained to my satisfaction," including "SiriusXM Satellite Radio with customer presets").

[3] *See* A.592 (Infiniti) ("select features that you would like demonstrated [on] your new 2018 Q50," including "SiriusXM® Satellite Radio with 3-month trial subscription"); A.1256 (iPad checklist).

[4] Mazda's checklist, for example, includes a box for "Audio Controls" that lists "Sirius XM® Activation and Operation," and later instructs the salesperson to "[e]xplain tool bar [entertainment] options" and "[s]ave customer's favorite radio stations." A.577–78.

[5] *E.g.*, A.575 (General Motors Certified Pre-Owned) (requiring salesperson to indicate that the "[c]ustomer [has been] informed of Sirius XM All-Access 3-month trial").

███████████████████████████████████████████████████████,” A.1163.

**2. Relationships with dealers.** SiriusXM also has agreements directly with dealers—of both new and used vehicles—to ensure that salespeople let consumers know that SiriusXM is a vehicle feature. Though broadly similar, those arrangements and their execution vary by dealer.

**SiriusXM literature.** SiriusXM sends dealers kits with literature and consumer brochures, some brand-specific, which dealers agree to place in SiriusXM-equipped vehicles. A.36–38, 109; *see, e.g.*, A.661, 670–71. SiriusXM also offers tags and stickers that dealerships may hang inside or affix to vehicles that describe the SiriusXM service and its availability. A.37, 960–62. Dealers, in turn, promote SiriusXM as a vehicle feature by displaying that advertising. *E.g.*, A.639–43, 1243; *infra* p. 6.

**Electronic contact.** SiriusXM regularly emails dealers about incentives for salespeople to explain SiriusXM's service, plus links for requesting additional free consumer brochures. A.37, 40–42; *see, e.g.*, A.673–79, 696–97, 732. SiriusXM also maintains a Dealer Portal where dealers can access brochures; view reminders to help consumers preset their favorite channels and explain to consumers that SiriusXM will contact them; and refresh their understanding of how to communicate SiriusXM's service to consumers on an e-learning center with training on, among other things, how to use delivery checklists. A.40–42. ████████████████████████████████████████████████████ ███████████████████████████████████████. A.41.

**Training.** SiriusXM representatives regularly visit dealerships to train salespeople on how to market SiriusXM. A.39–40. Training focuses on how to provide "impromptu floor, in car demonstrations," how to display SiriusXM materials, and how to "[s]pot check for activation issues and SXM listing on [M]onroney" labels. A.863–65. Representatives teach salespeople how to use the "SiriusXM Delivery Checklist": "[v]erify [that] the radio is active," "[g]ive [the] customer a brochure with channel guide," "[p]reset a few favorite channels," "[t]ell them SiriusXM will contact them to discuss subscription options," and "[i]nform them [that] they can also listen on the SiriusXM app or online with their trial" (and where they can go online to access their accounts). A.867. Salespeople are encouraged to explain the features of trial subscriptions, including SiriusXM's internet radio service, which permits

the consumer to access her account on the internet. A.865–66, 891, 917, 921, 975. Representatives also review incentives with salespeople, such as free trials, event tickets, and electronic devices salespeople can earn by completing e-learning. A.40–41, 866. Some salespeople report that they have received training from SiriusXM; others say they have not.[6] ████████████████████████████ ████████████████████████████████████████████. A.39.

**Placement of SiriusXM materials.** Most dealers place pamphlets throughout the dealership.[7] Some dealers also place pamphlets in glove boxes, A.1228, 1231, 1263, 1246, 1274, or otherwise "inside every new and certified pre-owned vehicle," A.1254, while other dealerships, in contrast, "cannot place materials inside the car that are not authorized by [the manufacturer]."[8] Some "[n]ew vehicles also come with a sticker on them explaining that the car has Sirius XM radio." A.1254; *see* A.1248.

**Dealer and "Service Lane" opt-in programs.** Most vehicles sold at CarMax, the nation's largest used-car dealer, come equipped with SiriusXM radios. A.42–43, 830–47. Although CarMax actively promotes SiriusXM as described above, A.43, CarMax customers must expressly opt in for CarMax associates to activate their trial subscriptions, A.44, 711. At that point, the associate informs the customer that CarMax will share her personal information with SiriusXM so SiriusXM can contact her. *Id.* Other dealers have similar opt-in setups. A.45, 828. SiriusXM also offers "Service Lane" trial subscriptions through dealer service departments and independent service facilities. A.42. As with CarMax, SiriusXM doesn't call service customers unless they say, in response to an email or in conversation with a service representative, that they want the trial subscription. *Id.*; A.988–90. ████████████ ████████████████████████████████████████████████. A.42.

**3. Individual salespeople.** Whether a prospective buyer or lessee knows that SiriusXM is a feature of the product she is buying or leasing, and whether she inquires about or uses SiriusXM, may

---

[6] Training: *e.g.*, A.1231, 1237, 1254, 1263, 1274. No training: *e.g.*, A.1235.

[7] *See* A.1228 ("in a stand-up display in our showroom"); A.1229 ("in our lounge area and on credenzas around the showroom"); A.1235 (at sales associates' desks, and "on stands by the door and tables in the customer waiting area").

[8] A.1229 (Audi); *see also* A.1237 ("The marketing materials are displayed throughout the dealership, but they are not placed inside the vehicles.").

depend on her engagement with particular salespeople.

**Discussion and demonstration.** Many salespeople mention SiriusXM or demonstrate it for consumers. *E.g.*, A.1228, 1254. Some "always" or "nearly always" tell consumers about SiriusXM, A.1229, 1235; *see* A.1274, although others "may not mention Sirius XM to 100% of customers," A.1263. ████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

A.1228, 1229, 1232, 1236, 1237, 1254, 1274.

**Individual differences.** Beyond those generalities, "[e]ach sales associate is different; some love SiriusXM's satellite radio services and will market the services to a greater extent than some sales associates who are less interested in the services." A.1275. Some salespeople give extensive demonstrations and "encourage [consumers] to take advantage of the … trial" because they might "end[] up really liking it." A.1268. As salespeople observe, "every customer is different when it comes to their desire for satellite radio." A.1264. "Some do not care about SiriusXM while others love it and really appreciate the free trial." *Id.* Salespeople often decide "[w]hether (and to what extent) to market Sirius XM's services … based on how they are reading the customer." A.1274–75.

**Consumer inquiries.** Consumers often ask about SiriusXM during discussions with salespeople. "[S]ome customers ask about [SiriusXM]" before the salesperson even has a chance to bring it up. A.1232; *see* A.1226, 1235. One salesperson "estimate[d] that 60–80% of buyers already are familiar that the vehicles come with Sirius" and generally "are interested in Sirius XM in some form … and want to know exactly how long the trial subscription in this particular vehicle is." A.1258. Sometimes customers ask "how they can continue service going forward." A.1259. One customer "managed to negotiate … that [the] dealership would pay for a one year subscription to Sirius XM." A.1258. Another customer paid $600 to have a SiriusXM radio installed in his car. A.1233; *see also* A.1241.

**Test drives.** Test drives are a prime opportunity to demonstrate and discuss SiriusXM. *E.g.*,

A.1225, 1228, 1229, 1235, 1242, 1243, 1244, 1264, 1275. Sometimes the salesperson will "ask customers about their music preferences and recommend channels to them" as "an important part of the way … to engage a consumer." A.1246; *see* A.1264. Other salespeople decide whether to play SiriusXM "[d]epending on the customer," and can often "guess a station [they] think the customer might like." A.1254. And some dealers, in contrast, "let the customers do the test drives on their own." A.1232.

**Delivery of vehicle.** Some dealers use manufacturer-provided checklists that require the salesperson to introduce the consumer to SiriusXM by name. *See* A.1231. Others use checklists that ask "if the sales associate has explained the radio system." A.1255. Many of these forms require signatures from the consumer and salesperson. A.1248, 1265; *e.g.*, A.564–90, 598–602. Salespeople who do not use a checklist may still discuss SiriusXM with the consumer, "ask what kind of music they like[,] and program a few Sirius XM stations for them." A.1229. In addition, some salespeople "help purchasers of pre-owned vehicles activate Sirius XM in their vehicle." A.1237; *see also* A.43. And if "the radio is not working at the time of vehicle delivery," some salespeople "offer to call Sirius XM from the customer's cell phone in order to request a 'refresh' of the radio signal." A.1247. Finally, although salespeople work to promote SiriusXM's service, SiriusXM allows dealers to elect not to share contact information of a consumer who objects or wants to opt out of the trial subscription. A.38.

### C.   SiriusXM maintains contact with consumers after purchase or lease

Whether vehicle buyers and lessees inquire about SiriusXM radio or otherwise transact with SiriusXM depends on their awareness of, and engagement with, the service. SiriusXM conveys information about its radio service to buyers and lessees in various ways. ████████████████

████████████████████████████████████████████████████

████████. In fact, some consumers even "beat the record" by contacting SiriusXM before SiriusXM receives their information from OEMs or dealerships. A.13, 1161.

**1. Materials in glove box and owner's manuals.** OEMs and dealers place materials about SiriusXM in the glovebox, *supra* pp. 3, 6, and, in most cases, in the owner's manual, A.31–34. Most manuals identify the satellite radio service, often mentioning SiriusXM by name, and explain how to

sign up for or extend a subscription. *E.g.*, A.33–34, 394, 397–99, 415, 418, 423–24, 446–50, 491, 508, 511–12, 519–20, 543–44, 548. But the details vary. Volkswagen's owner's manual, for instance, devotes five pages to "SiriusXM satellite radio mode." A.548–52. Some manuals direct the reader to SiriusXM's website or phone number, *e.g.*, A.419–20, 424; others direct inquiries to an "authorized . . . dealer," A.491. A Jeep owner's manual states that "Sirius will supply a welcome kit that contains general information, including how to setup your on-line listening account at no additional charge." A.424. Other owner's manuals mention SiriusXM by name only once. *E.g.*, A.520.

**2. Welcome kits and emails.** SiriusXM sends welcome kits and emails, some co-branded with the OEM, to buyers and lessees. A.13–18; *see, e.g.*, A.1027–1118. Those kits welcome the consumer to the service and explain how to contact SiriusXM to subscribe or learn more. A.14. And the emails contain links to SiriusXM's website and a page where consumers can confirm their email addresses and manage their contact preferences. A.15–16. ███████████████████████ ███████████████████████████████████. A.15.

**3. Online materials and streaming service.** SiriusXM's website provides extensive information about the service, including a Frequently Asked Questions page and a chat feature trial subscribers can use to learn more. A.17. For the past few years, most SiriusXM trial subscriptions have allowed consumers to stream SiriusXM content from the internet. A.17–18. ████████████ ████████████████████████████. A.18.

**4. Consumers use their trial subscriptions.** ████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████ These significant levels of trial subscriber engagement are unsurprising, for OEM/JD Power surveys rank satellite radio as one of the features consumers value most. A.46, 973.

**D.    SiriusXM calls trial subscribers**

Vendors call trial subscribers on SiriusXM's behalf based on information provided by dealerships. A.18, 1149–62. In many cases, the script instructs the agent to explain that she is "calling from

[Ford Motor Company/ Lexus/etc. and] SiriusXM." A.18, 1289. Those calls play out in different ways. In some, a consumer might state that she is not interested in purchasing a paid subscription at the moment. A.18–20. But in others, consumers express interest, ask about SiriusXM's service, or transact with SiriusXM. *See infra* p. 19. For instance, one call recipient who was unaware of the trial subscription before the call asked, "Can [I] arrange it so that [the free trial] starts now?" and "Could we maybe set another call back [in] a couple weeks?" A.1570–71. Unsurprisingly, given SiriusXM's efforts, roughly 40% of new-car buyers and lessees, ███████████████████████████ convert to paid subscriptions. A.25. Still, SiriusXM's vendors have procedures to honor any opt-out requests they receive. *Id.*

### E.    Buchanan sues SiriusXM

Plaintiff Thomas Buchanan purchased a 2011 Honda Odyssey in May 2016. Compl. ¶ 29. According to his current version of the facts, SiriusXM began calling him on July 19, 2016, to offer him a paid subscription. *Id.* ¶ 34. Buchanan also claims that he sent SiriusXM a letter opting out of such calls on Sunday, July 24, 2016. *Id.* ¶ 36. In reality, Buchanan did not opt out until (at least) August 1, 2016, when he mailed SiriusXM a certified letter asking for a copy of its do-not-call policies. A.27.

SiriusXM stopped calling Buchanan by August 4, 2016, Compl. ¶ 34—even though Buchanan's letter requested only SiriusXM's policy document and not an end to calls, A.27. Then Buchanan sued SiriusXM twice in small-claims court, which dismissed the first suit and allowed him to withdraw the second. A.27, 1168–83, 1199–1221. Undeterred, and convinced that unwanted phone calls present a more serious problem than child abductions, Buchanan next brought this suit in the hopes of recovering gambling money. A.1193–94, 1196. He seeks to represent two separate classes: those residential landline subscribers whom SiriusXM called despite their presence on the nationwide DNC Registry, and those residential landline subscribers whom SiriusXM called after they told SiriusXM they no longer wished to be contacted. Compl. ¶¶ 39, 41. Buchanan's DNC class would sweep in millions of people based on hundreds of millions of calls—on average, around 22 calls per class member. *See* A.18. For that class alone, he thus seeks tens to hundreds of billions in damages (at $500 to $1,500 per call). On May 29, 2018, after long delays, Buchanan moved to certify these classes.

**ARGUMENT**

Buchanan's motion for class certification should be denied. The central question about the proposed DNC Registry class is whether SiriusXM and any individual trial subscriber had an established business relationship (EBR). If so, a call does not violate the TCPA. But that determination is not susceptible to generalized, classwide proof. The relationship between SiriusXM and each trial subscriber turns on a variety of case-specific facts, including the OEM's presentation of information about SiriusXM and whether the consumer viewed it; the salesperson's presentation; whether the consumer asked the salesperson questions about SiriusXM, visited SiriusXM's website, called the company, or requested a signal refresh; whether, during a call from SiriusXM, the consumer asked questions, asked for a call back, or transacted with SiriusXM; and each consumer's expectations that she would be called based on these factors and many others. Such questions about each consumer's unique circumstances predominate. And answering those questions requires individualized inquiries—it can't be done based on generalized, classwide evidence. Buchanan's proof of his unusual individual claim would not cover the circumstances of millions of other consumers. Nor is classwide adjudication superior to individual litigation. Individuals who object to such calls have sufficient financial incentives to pursue their own claims—as Buchanan did here—while aggregate litigation would force SiriusXM to choose between betting the company on a single case and abandoning its meritorious defenses.

The internal-do-not-call class also fails the predominance requirement. Determining whether SiriusXM honored a call recipient's do-not-call request within a reasonable time requires an individualized inquiry into the circumstances, delivery, and timing of her request. That proposed class also fails the adequacy and typicality requirements. SiriusXM honored Buchanan's opt-out request well within 30 days, and because Buchanan cannot keep his story straight about when he opted out, he cannot advance the position of those whose claims are not subject to the same defenses.

## I. Buchanan's DNC Registry class (Count I) fails Rule 23's rigorous predominance and superiority requirements

"A party seeking class certification must affirmatively demonstrate his compliance" with Federal Rule of Civil Procedure 23(a)'s numerosity, commonality, typicality, and adequacy requirements.

*Wal–Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 349–50 (2011). For damages classes, he must also clear Rule 23(b)(3)'s "far more demanding" hurdle, *Amchem Prods., Inc.* v. *Windsor*, 521 U.S. 591, 624 (1997), by showing that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," Fed. R. Civ. P. 23(b)(3).

Buchanan has not met that standard. SiriusXM can show through individualized proof that it has EBRs with (at least) a significant portion of the proposed class, because individual consumers transacted with SiriusXM when they purchased or leased vehicles they knew came equipped with a trial subscription. And even on a narrower view of an EBR, SiriusXM can show that class members made qualifying inquiries and transactions. Either way, the EBR issue cannot be resolved through common evidence, but rather turns on the widely varying circumstances in which consumers bought, leased, or serviced their vehicles or interacted with SiriusXM. Buchanan's unwieldly class flunks Rule 23(b)(3)'s predominance and superiority requirements.

## A.    Class representatives must prove predominance and superiority

To evaluate predominance, the court must "identify[] the substantive issues that will control the outcome [at trial], assess[] which issues will predominate, and then determin[e] whether the issues are common to the class, a process that ultimately prevents the class from degenerating into a series of individual trials." *Gene & Gene LLC* v. *BioPay LLC*, 541 F.3d 318, 326 (5th Cir. 2008). To predominate, a question "must be definitively answered for all class members using a generalized set of facts and producing one unified conclusion." *Hancock* v. *Chi. Title Ins. Co.*, 263 F.R.D. 383, 390 (N.D. Tex. 2009) (Fitzwater, C.J.), *aff'd sub nom. Benavides* v. *Chi. Title Ins. Co.*, 636 F.3d 699 (5th Cir. 2011). A TCPA case with consent or EBR issues satisfies Rule 23's predominance requirement only if its "unique facts" show that individual adjudication of those issues is unnecessary. *Gene*, 541 F.3d at 326.

*Gene* is instructive. Gene alleged that BioPay sent more than 4,000 unlawful fax advertisements. *Id.* at 322. Although BioPay admitted that it culled some fax numbers from "purchased databases," it also showed that, while it didn't keep detailed records, it "periodically culled fax numbers from other

sources—from information submitted by merchants through BioPay's website, from information submitted at trade shows BioPay attended, and also from lists of companies with which BioPay or its affiliates had an established business relationship." *Id.* at 323. The district court nonetheless certified the class because "BioPay sent its fax advertisements as part of a common course of conduct." *Id.*

The Fifth Circuit reversed. Explaining that the consent or EBR issue would "entirely determine how the proposed class-action trial w[ould] be conducted on the merits," *id.* at 327, the court noted that Gene had failed to "present[] facts or arguments to" establish that disputes over whether someone consented "will not exist as to a significant number of class members." *Id.* at 329. Indeed, BioPay employees testified that BioPay sometimes "obtained prior express invitation or permission," that they "culled fax numbers from a variety of sources over a period of time," and that "there is no class-wide basis for distinguishing which recipients gave consent and which did not." *Id.* at 328–29. Because Gene had advanced no method for avoiding "myriad mini-trials" on consent, "the district court abused its discretion in certifying the class." *Id.* at 329; *see Hancock*, 263 F.R.D. at 389 n.9 (discussing *Gene*); *accord Sandusky Wellness Ctr., LLC* v. *ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 468–70 (6th Cir. 2017) (affirming denial of certification where "the predominant issue of fact is undoubtedly one of *individual* consent" requiring "form-by-form inquiry"), *cert. denied*, 138 S. Ct. 1284 (2018).[9]

Rule 23(b)(3) also requires a class-action plaintiff to show that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy"—that is, that classwide

---

[9] Many district courts have similarly found certification inappropriate in TCPA cases where it "would require the court to conduct individual inquiries with regard to each potential class member" to determine whether she had given consent or had an EBR with the caller. *Kenro, Inc.* v. *Fax Daily, Inc.*, 962 F. Supp. 1162, 1169 (S.D. Ind. 1997) (quoting *Forman* v. *Data Transfer, Inc.*, 164 F.R.D. 400, 403 (E.D. Pa. 1995)); *see, e.g., Levitt* v. *Fax.com*, No. 05-949, 2007 WL 3169078, at *3 (D. Md. May 25, 2007); *Connelly* v. *Hilton Grand Vacations Co.*, 294 F.R.D. 574, 577–79 (S.D. Cal. 2013) (Hilton obtained numbers in "different ways"—"over the phone, online, or by filling out a paper application, as well as from guests that reserved rooms at Hilton hotels online, over the phone, through third parties, or through online or brick-and-mortar travel agencies"—so consent had to "be evaluated on an individualized basis"); *Meyer* v. *Bebe Stores, Inc.*, No. 14-0267, 2016 WL 8933624, at *2, 6–8 (N.D. Cal. Aug. 22, 2016) (number collection, in "unique interaction[s]" "through various means: salesperson interactions after a transaction … ; 'client capture cards'; and [online] customer opt-ins," meant consent question couldn't "be answered on a classwide basis"); *Newhart* v. *Quicken Loans Inc.*, No. 15-81250, 2016 WL 7118998, at *4–5 (S.D. Fla. Oct. 12, 2016) ("join[ing] the chorus of other courts").

litigation would outperform alternatives such as individual lawsuits. *See In re TWL Corp.*, 712 F.3d 886, 896 (5th Cir. 2013). "The predominance of individual-specific issues relating to the plaintiffs' claims … detracts from the superiority of the class action device in resolving th[o]se claims," *Allison* v. *Citgo Petroleum Corp.*, 151 F.3d 402, 419 (5th Cir. 1998), particularly where one-on-one litigation is feasible.

### B.   The FCC has broadly defined what counts as an EBR

Calls to individuals on the DNC Registry do not violate the TCPA if the parties have an EBR. *See* 47 U.S.C. § 227(a)(4)(B); 47 C.F.R. § 64.1200(f)(14)(ii). The governing FCC regulation defines EBRs broadly to cover purchases of the caller's products, as well as "transaction[s]," "inquir[ies]," and "application[s] regarding products or services offered by the [caller]," "with or without an exchange of consideration." 47 C.F.R. § 64.1200(f)(5). The FCC has interpreted that regulation broadly and has often applied agency principles to the TCPA. Section 64.1200(f)(5) provides:

> a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, on the basis of the subscriber's purchase or transaction with the entity within the … (18) months immediately preceding the date of the telephone call or on the basis of the subscriber's inquiry or application regarding products or services offered by the entity within the three months immediately preceding the date of the call, which relationship has not been previously terminated by either party.

As the FCC explained in its first order addressing the TCPA, the EBR "exemption [is] broad enough to encompass a wide range of business relationships" and does not require "an exchange of consideration." *In re Rules & Regs. Implementing the TCPA*, 7 FCC Rcd. 8752, 8771 (1992). "The relationship may be formed with or without an exchange of consideration on the basis of an inquiry, application, purchase or transaction by the [call recipient] regarding products or services offered by the telemarketer." *Id.* at 8771. This "broad definition" covers many obvious EBRs (such as "publishers with subscribers" and "credit agreements") "without eliminating legitimate relationships not specifically mentioned in the record." *Id.*[10]

The FCC reiterated the need for a broad EBR exemption in 2003 when it established the

---

[10] *See also, e.g., Nigro* v. *Mercantile Adjustment Bureau, LLC*, 769 F.3d 804, 806 (2d Cir. 2014) (per curiam) ("[T]he FCC defines [the term 'EBR'] broadly."); *CE Design, Ltd.* v. *Prism Bus. Media, Inc.*, 606 F.3d 443, 451 (7th Cir. 2010) ("[T]he term 'business relationship' should be construed broadly ….").

nationwide DNC Registry and extended the EBR exemption to calls placed to residential numbers on that list. *See In re Rules & Regs. Implementing the TCPA*, 18 FCC Rcd. 14,014, 14,043 (2003) (*2003 TCPA Order*). The FCC offered several examples: "magazines and newspapers [that] may want to contact customers whose subscriptions have or soon will expire and offer new subscriptions," *id.* at 14,043; companies desiring "to make new offers to existing customers, such as mortgage refinancing, insurance updates, and subscription renewals," because customers may "benefit from calls that inform them in a timely manner of new products, services and pricing plans," *id.* at 14,078; and companies looking to "'winback' or 'renew' [a] customer's business" where, "[f]or example, a consumer … once had telephone service with a particular carrier or a subscription with a particular newspaper," *id.* at 14,080. In such instances, a consumer "could expect to receive a call from those entities." *Id.*[11]

The FCC also explained that the EBR exemption could not be "narrowed to only include situations where a purchase or transaction is completed." *Id.* An inquiry likewise "create[s] an expectation on the part of the consumer that a particular company will call them." *Id.* at 14,080–81. Consistent with that guidance, courts have found that customer transactions or inquiries create EBRs. *See, e.g.*, *Hamilton* v. *Spurling*, No. 11-0102, 2013 WL 1164336, at *7–10 (S.D. Ohio Mar. 20, 2013) ("inquiry" where plaintiff's wife set up appointment when chiropractor called); *Morris* v. *Copart*, No. 15-724, 2016 WL 6608874, at *9 (E.D. Tex. Nov. 9, 2016) (EBR formed where plaintiff said he wished to donate a car and received calls to coordinate pick-up); *Zelma* v. *Conway*, No. 12-0256, 2013 WL 6498548, at *2 (D.N.J. Dec. 11, 2013) (plaintiff's wife had "transaction" with company when she elected to receive free subscription to magazine through frequent-flyer program).

Notably, the entity that has the EBR with the call recipient need not take all relevant actions

---

[11] The FCC reasoned that "the ability of sellers to contact existing customers is an important aspect of their business plan and often provides consumers with valuable information regarding products or services that they may have purchased from the company." *2003 TCPA Order*, 18 FCC Rcd. at 14,043. "[C]onsumers have come to expect calls from companies with whom they have such a relationship," it continued, and "may be willing to accept these calls." *Id.* at 14,078.

itself. Instead, the FCC has often applied agency principles to the TCPA and its exceptions. For instance, third-party "telemarketers may rely on the seller's EBR to call an individual consumer to market the seller's services and products." *2003 TCPA Order*, 18 FCC Rcd. at 14,083. Similarly, a caller may "obtain[] consent through an intermediary." *Mais* v. *Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1123 (11th Cir. 2014) (quoting *In re GroupMe, Inc./Skype Commc'ns S.A.R.L. Pet.*, 29 F.C.C. Rcd. 3442, 3447 (2014)). In the same vein, the FCC has instructed that "if a consumer purchases a seller's products at a retail store or from an independent dealer, such purchase would establish a business relationship with the seller, entitling the seller to call that consumer under the EBR exemption." *2003 TCPA Order*, 18 FCC Rcd. at 14,083 n.382; *see also Gene*, 541 F.3d at 322 (recognizing that principal may have had EBR with certain fax recipients for purposes of faxes made "through a third-party contractor"); *Zelma*, 2013 WL 6498548, at *2 ("[T]he fact that Plaintiff's wife may not have paid Prevention Magazine directly for the subscription is of no consequence."). In short, "common law agency-related principles" apply. *In re Joint Pet. Filed by Dish Network, LLC*, 28 F.C.C. Rcd. 6574, 6593 (2013); *see id.* at 6590 ("[T]he principles governing the scope of the TCPA's exemptions from liability by telemarketers and sellers should [not] differ from those governing the scope of the statute's consumer protections.").

Finally, a caller's EBR extends "to affiliated entities" if the call recipient "would reasonably expect them to be included [in the EBR] given the nature and type of goods or services offered by the affiliate and the identity of the affiliate." 47 C.F.R. § 64.1200(f)(5)(ii). "[C]ontact by an affiliate of the company having the business relationship would be permissible if the solicitation by the affiliate related to a transaction in progress with the subscriber or was substantially related to the product or service forming the basis of the business relationship." H.R. Rep. No. 102-317, p. 15 (1991). In those circumstances, subscribers "expect[] … affiliated companies to solicit" them. *Id.*

### C.  Assessing whether SiriusXM had EBRs with class members would require millions of mini-trials

This case is a hornbook example of individualized inquiries' overwhelming the determination of common issues by generalized, classwide proof. SiriusXM had an EBR with most proposed class

members, because most of those individuals knowingly transacted with SiriusXM when buying or leasing vehicles with trial subscriptions. Even on a narrower understanding of the FCC regulation, SiriusXM still had an EBR with a significant percentage of the proposed class based on consumers' inquiries and transactions. Either way, litigating those EBR questions would require millions of individualized inquiries. As a result, Buchanan can't establish predominance or superiority.

**1. SiriusXM expects to present evidence showing that it had EBRs in most instances.**

SiriusXM has EBRs with most of the proposed class members for the simple reason that purchase or lease of a SiriusXM-equipped vehicle constitutes a "purchase or transaction with" SiriusXM under the EBR regulation, 47 C.F.R. § 64.1200(f)(5). Under SiriusXM's agreements with OEMs and dealers, dealer personnel act as SiriusXM's agents in communicating with prospective vehicle buyers and lessees. *See supra* pp. 15–16; *see also, e.g.*, A.832 (SiriusXM "appoints [Carmax] as its agent"); A.491 ("For more information on subscribing to the SiriusXM service, contact an authorized Bentley dealer."); A.1253 (salesperson contacts SiriusXM representative when "[c]ustomers … occasionally complain[] that their Sirius XM trial ended prematurely"). Materials throughout dealerships and interactions with salespeople notify consumers that some vehicles come with trial subscriptions, that the dealer will share their contact information with SiriusXM, and that SiriusXM will reach out to them. And if opt-out requests occur, dealers honor them by not passing along the consumer's contact information.[12] Accordingly, when an individual purchases or leases such a vehicle, aware of the SiriusXM equipment and subscription, she purchases SiriusXM products, or at the very least "transact[s]" with SiriusXM, for purposes of the EBR regulation: Dealer personnel acting as SiriusXM's agents complete the "voluntary two-way communication" between SiriusXM and vehicle buyers and lessees, who consequently "could expect to receive a call from" SiriusXM. *2003 TCPA Order*, 18 FCC Rcd. at 14,080.

The affiliate regulation compels the same result: Because vehicles are outfitted with SiriusXM equipment and come with a trial subscription, and because salespeople and materials from SiriusXM

---

[12] *Supra* p. 8. Conversely, CarMax and Service Lane customers must affirmatively opt-in (and thereby "transact[] with" SiriusXM) to receive a trial subscription. *Supra* p. 6.

inform buyers and lessees that SiriusXM will contact them, those buyers and lessees "would reasonably expect [SiriusXM] to be included [in the EBR with the dealership or OEM] given the nature and type of goods offered by [SiriusXM]." *Id*.; *see also supra* p. 3 (noting Toyota and Honda agreements). Consumer surveys show that consumers are aware of SiriusXM's service in significant numbers, and OEM/JD Power surveys report that satellite radio is one of the features consumers value most. *Supra* pp. 7–9. And the fact that significant percentages of trial subscribers actually convert to paid subscriptions, *supra* p. 10, validates the reasonable expectation of vehicle purchasers and lessees.

Under either approach, SiriusXM expects to be able to show that the vast majority of proposed class members purchased or leased their vehicles knowing that SiriusXM equipment and a trial subscription were part of the transaction. Making that showing would require an individualized inquiry for millions of consumers involving these questions and many others: Did they see information about SiriusXM on the Monroney label of the vehicle? On a brochure in the showroom? On a hang tag on a particular vehicle? On the OEM's website? The dealer's website? Did they learn about SiriusXM during conversations with salespeople? On a test drive? Did they expect to hear from SiriusXM? The "nearly endless" "permutations" that predominate are incompatible with the class-action device. *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 38 (2013). And Buchanan's atypical claim that he had no idea SiriusXM was installed in his vehicle only reinforces the inappropriateness of the class-action device here.

**2. Individualized inquires predominate even on a narrower understanding of EBRs.**
SiriusXM would also expect to show that a significant proportion of the proposed class members formed EBRs with SiriusXM through inquiries or transactions regarding SiriusXM's satellite radio services. Once again, evaluating the relevant circumstances would be an inherently individualized, fact-intensive process. The opportunities for inquiry within the meaning of the EBR regulation—and which vary by OEM, dealer, form, salesperson, and consumer—are legion:

- From the beginning of the vehicle-buying or -leasing process, consumers ask salespeople about SiriusXM. Sometimes consumers ask questions after the salesperson introduces SiriusXM and explains that SiriusXM will contact them. Sales materials from SiriusXM underscore that point. In other instances, the consumer asks about SiriusXM without prompting. That is unsurprising given consumers' level of familiarity with SiriusXM and

the multiple advertisements for SiriusXM on OEM and dealer websites, brochures in showrooms, vehicle hang tags, and other advertising. *Supra* pp. 3, 6. Salespeople explain:

  o "Customers often bring up SiriusXM during the sales process." A.1265.

  o "I had a customer ask for the satellite radio to be installed." A.1233.

- Salespeople often demonstrate SiriusXM during test drives. Those discussions are a prime opportunity for consumers to ask questions about SiriusXM, especially where salespeople ask consumers about their music preferences and recommend channels. *Supra* pp. 7–8.

- Discussions about SiriusXM continue upon delivery of the vehicle and signing of paperwork. As noted, many OEMs' delivery checklists require discussion, if not demonstration and collaborative presetting, of SiriusXM radio, followed by the consumer's signature. And electronic delivery checklists themselves allow on-the-spot inquiries. *Supra* p. 8.

- "It is not uncommon" for consumers to contact SiriusXM before the dealer transmits the consumer's contact information to SiriusXM. A.1161.

- CarMax and Service Lane customers must affirmatively opt-in to receive a trial subscription. *Supra* p. 6. Opting in is a transaction with SiriusXM—if not express written consent.

- Consumers transact with SiriusXM when they use their trial subscription to listen to SiriusXM radio. As ███████ makes clear, a significant percentage of drivers listen to SiriusXM during their trial subscriptions. *Supra* p. 9.

- ████████████████████████████████████████████████████
  ████████████████████████████████. A.15.

- Using contact information in welcome kits and emails, trial subscribers may inquire of or transact with SiriusXM by visiting SiriusXM's website to learn more about the service; calling SiriusXM to ask questions; or requesting signal refreshes. *Supra* pp. 3, 8–9.

- Consumers transact with SiriusXM by visiting SiriusXM's website or downloading SiriusXM's mobile app and logging in to access SiriusXM's online streaming service. A.18.

- Consumers ask about SiriusXM *during the very calls Buchanan challenges,* as a review of transcripts of individual calls confirms. The *only* way to examine *any* of those millions of calls is to review them one by one. Those conversations reveal that consumers sometimes:

  o Ask when the trial subscription starts or can start. *See supra* p. 10; A.1570–71.

  o Ask about the SiriusXM plans and pricing, including setting up the service in another vehicle. A.1642–43, 1665, 1744–45.

  o Ask about different plans and then request a follow-up email or phone call, often after an opportunity to speak with a spouse. A.1626–27, 1631, 1656–57, 1680, 1695–97, 1750–52.

These examples illustrate that only individualized inquiries, and not generalized, classwide evidence, can answer the EBR question across Buchanan's proposed DNC Registry class.

Moreover, and compounding the unmanageability of Buchanan's proposed class action, there may be multiple inquiries or transactions *per consumer*. That means the Court could not rest just because it identified an inquiry or transaction in one call recording. Instead, the Court would need to determine whether an inquiry or transaction occurred during *any earlier* call or otherwise during the vehicle-acquisition process to determine which challenged calls took place before, and which after, an EBR was formed. And although salespeople provide ample evidence of consumer inquiries, vehicle buyers and lessees are likely to be best positioned to recall the pertinent circumstances of their individual vehicle-acquisition experiences. SiriusXM would have the right to depose millions of class members about those experiences, in addition to introducing millions of individualized records (such as audio recordings of calls) evidencing what happened during putative class members' one-on-one contacts with SiriusXM. It is hard imagine a situation that more obviously fails the predominance requirement.

**3. A class action would not be superior to individual litigation.** For the same reasons individual EBR questions predominate, classwide litigation is inferior to individual litigation. Class actions create no economy of scale (Buchanan Mem. 23–24) where the claims must be litigated individually *anyway*, as would be true here given SiriusXM's EBR defense.

But class litigation is inferior for at least two additional reasons. *First*, "[t]he most compelling rationale for finding superiority in a class-action—the existence of a negative value suit—is missing in this case." *Castano* v. *Am. Tobacco Co.*, 84 F.3d 734, 748 (5th Cir. 1996). If, as Buchanan insists, SiriusXM called proposed class members unlawfully and willfully, then based on an average 22 calls per consumer, the average proposed class member would stand to recover, contrary to Buchanan's assertion of $500 to $1,500 (Mem. 24), between $11,000 and $33,000. *See* 47 U.S.C. § 227(b)(3) ($500 per call; $1,500 if willful). That's enough for individual suits, *e.g.*, *Kase* v. *Salomon Smith Barney, Inc.*, 218 F.R.D. 149, 160 (S.D. Tex. 2003) (no superiority in part because the class members' claims were "worth tens of thousands of dollars each"), as Buchanan demonstrated by pursuing a small-claims

lawsuit at first (thereby also showing that these issues are not so complex that the consumer, who personally has access to the evidence relevant to his case, must retain a lawyer). *Second*, certification would seriously prejudice SiriusXM by putting it to an impossible choice: bet the company or buy peace from Buchanan's fleet of lawyers despite the merits of its defenses. In these circumstances, SiriusXM's "potential liability would be enormous and completely out of proportion to any harm suffered by the plaintiff," *London* v. *Wal–Mart Stores, Inc.*, 340 F.3d 1246, 1255 n.5 (11th Cir. 2003), and a class action would not be a proper, let alone superior, mechanism for managing the case.

### D.  Buchanan's counterarguments lack merit

**1.** Buchanan claims that "[p]redominance is 'readily met'" because "[a]ll of the material conduct or claim [sic] particular to [him] were also practiced upon every member of the classes in the same manner." Mem. 21–22. That is because, he continues, SiriusXM "follows the same processes with all consumers." Mem. 23. But the Fifth Circuit dismantled that very argument in *Gene*, where the plaintiff argued that "individual determinations [were] unnecessary" because "all of the faxes were sent in accordance with the same procedure." 541 F.3d at 328. The argument conflates Rule 23(a)(2)'s commonality inquiry with Rule 23(b)(3)'s "far more demanding" "predominance criterion." *Amchem*, 521 U.S. at 623–24. "Merely asking the same questions across a spectrum of thousands of potential plaintiffs does not satisfy the strictures of Rule 23(b)(3)." *Hancock*, 263 F.R.D. at 388. "A class plaintiff cannot merely point to a 'common course of conduct' without also demonstrating 'whether the common course of conduct provide[s] a class-wide basis for *deciding* the predominant class issues of fact and law.'" *Id.* (emphasis added; quoting *Gene*, 541 F.3d at 326); *see supra* Section I.A. Here, the EBR issue means "the material conduct" is *not* the same, but instead occurred in individual, fact-dependent circumstances. While SiriusXM's overarching approach to marketing its services may signal the presence of common issues, it does not mean that those common issues predominate.[13]

---

[13] Buchanan also suggests that the Court need not examine "the merits of the class claim." Mem. 9; *see* Mem. 11. But a court may not "refus[e] to entertain arguments" against class certification "simply because those arguments would also be pertinent to the merits determination." *Comcast*, 569 U.S. at 34. Where predominance is drawn into question, "the court 'must consider how a trial on the merits

**2.** Buchanan also contends that "[a]t least one Court and two states have analyzed [SiriusXM's] processes and concluded that they do not establish a preexisting business relationship." Mem. 23 (emphasis omitted). Buchanan misstates the case, and the state determinations are inapposite.

**a.** Far from ruling on EBRs, the case to which Buchanan refers (Mem. 4), *Hooker* v. *Sirius XM Radio, Inc.*, No. 13-3, 2014 WL 12597593 (E.D. Va. June 5, 2014), does not even mention them. Instead, the court there determined that trial subscribers were not bound by an agreement SiriusXM had mailed to them. *Id.* at *5–6. That ruling says nothing about whether any given trial subscriber and SiriusXM had an EBR, which requires no "exchange of consideration," 47 C.F.R. § 64.1200(f)(5), let alone a *contract*. And the court's later order approving a settlement likewise doesn't mention EBRs. Final Order Approving Settlement & Certifying Settlement Class, *Hooker*, No. 13-3 (E.D. Va. Dec. 22, 2016), ECF No. 209. In any event, the parties' agreed-upon definition of a class is not precedent.

**b.** Buchanan also points (Mem. 7–8) to letters from two state executive branches: ███████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████

If ████████████████ had truly concluded that SiriusXM's millions of calls to their residents violated the law, they would have sued, not sent milquetoast letters. *See* 47 U.S.C. § 227(g) (authorizing states to recover $500 to $1,500 per call for violations). And in any event, even on questions of state law, the "views of the State's attorney general, while attracting 'respectful consideration,' do not garner controlling weight." *Animal Sci. Prods., Inc.* v. *Hebei Welcome Pharm. Co.*, 138 S. Ct. 1865,

---

would be conducted if a class were certified.'" *Hancock*, 263 F.R.D. at 387; *see supra* Section I.A.

Nor can Buchanan get around the predominance requirement by defining the class to exclude individuals with whom SiriusXM had an EBR. The EBR issue will predominate regardless of whether it defines class membership at the outset or determines an individual's ultimate entitlement to relief. Indeed, the proposed class in *Gene* itself excluded "recipients from whom the Defendant ha[d] received the prior express invitation or permission to receive" faxes, 541 F.3d at 323 n.5, and still the Fifth Circuit vacated class certification as an abuse of discretion on predominance grounds.

1868 (2018). On the merits, both states were simply wrong. The ██████████████████████

misapplied agency principles, *see* A.1285–86, with reasoning that could exclude all manufacturers of

purchased products, contrary to the FCC's guidance. *See supra* pp. 15–16. And it did not opine on

whether inquiries or transactions may create an EBR, in the particular circumstances ██████████████

████████████████████. The ████████████████████████ is even more devoid of

reasoning. These executive-branch positions do not come close to resolving the EBR questions for

the few calls the states claimed to examine, let alone the millions Buchanan seeks to litigate.

## II. The Internal-DNC class (Count II) shouldn't be certified either

Buchanan also improperly seeks to represent all persons who received residential calls "after

registering their telephone number with [Sirius'] Company-Specific Do-Not-Call Registry." Mem. 14.

### A. Individual questions predominate

To begin, callers are not strictly liable for every call placed after receiving an opt-out; instead,

they "must honor [such requests] within a *reasonable time*," a period which "may not exceed thirty days."

47 C.F.R. § 64.1200(d)(3) (emphasis added). But what counts as "reasonable" cannot be determined

on a classwide basis. It is impossible to determine whether SiriusXM honored a request within a "rea-

sonable time" without knowing how long it took SiriusXM to honor the request, and there will often

be disputes about when the consumer opted out. Here, for example, Buchanan and SiriusXM dispute

when he opted out. *See infra* pp. 24–25; *see Martin* v. *Comcast Corp.*, No. 12-6421, 2013 WL 6229934, at

*6 & n.3 (N.D. Ill. Nov. 26, 2013) (requiring discovery into "whether the letter was actually sent,"

"when [it] was actually sent, by what method, and when it was received"). Others could disagree with

SiriusXM in different ways. For instance, one might believe that saying "I'd rather not talk about this"

sufficed to opt out, while SiriusXM might not have removed that person until after a clearer request.

Even if SiriusXM and proposed class members *agreed* about their opt-out dates, the claims

could not be adjudicated in one fell swoop. "Reasonableness" is context-dependent. *Compare Simmons*

v. *Charter Comm'ns, Inc.*, 222 F. Supp. 3d 121, 140 n.14 (D. Conn. 2016) (given evidence, 15 days

reasonable "as a matter of law"), *with Martin*, 2013 WL 6229934, at *6 (unable to conclude on motion

to dismiss "that a week or 10 days is reasonable as a matter of law"). Thus, those whose requests were honored within a few days or a week are in a different position than those whose requests may have taken longer to process. And even those whose requests took the same time to process may not be similarly situated, for it may be reasonable to take more time to honor written demands than oral requests (or vice versa), to take more time to process ambiguous requests than unambiguous ones, and so on. *See Martin*, 2013 WL 6229934, at *6 (requiring discovery on whether "making two nearly simultaneous requests—one oral and one written—affects the [reasonableness] analysis"). The myriad mini-trials required to evaluate each class member's claim defeat predominance. *Supra* Section I.A.

### B.      Buchanan cannot establish typicality or adequacy under Rule 23(a)

Because he "is subject to … unique defense[s] that [are] likely to become a major focus of the litigation," Buchanan isn't an appropriate class representative. *Beck* v. *Maximus, Inc.*, 457 F.3d 291, 301 (3d Cir. 2006). Unlike proposed class members called more than 30 days after opting out, Buchanan must prove that SiriusXM did not honor his request within a "reasonable time." Further, unlike many called fewer than 30 days after opting out, he must argue for a stringent version of "reasonableness": He concedes that calls to him stopped after August 4, so SiriusXM took (at most) 11 total days (and 9 business days) to process his request, even if the factfinder were to agree with his disputed version of events. *But see Simmons*, 222 F. Supp. 3d at 140 n.14 (15 days reasonable as a matter of law). Given the clear differences between Buchanan's claims and those of many of his proposed class members, the danger that he will "become distracted" by those differences—leaving "the representation of the rest of the class [to] suffer"—makes his claims atypical and his representation inadequate. *CE Design Ltd.* v. *King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011).

Buchanan is further inadequate because his "differing accounts about the letters that form the very basis for his lawsuit surely would create serious concerns as to his credibility at any trial." *Savino* v. *Comp. Credit, Inc.*, 164 F.3d 81, 86–87 (2d Cir. 1998). Buchanan attached to his complaint an opt-out letter purportedly mailed to SiriusXM on Sunday, July 24, 2016. A.1223. Yet evidence he submitted with his original small-claims complaint asserted that he did not learn that SiriusXM was making calls

to him until July 29, 2016, and that he first sent a letter to SiriusXM on August 1 by certified mail, A.1208–14—the same way he always used to communicate with businesses, *see* A.1173–74. Class certification is improper where, as here, questions about the "honesty and trustworthiness of the named plaintiff" go the heart of the case. *Savino*, 164 F.3d at 87.

## III.    Standing questions likewise defeat predominance for both proposed classes

Both classes fail Rule 23(b)(3)'s predominance requirement for another reason: It will be impossible to determine classwide whether proposed class members have standing to challenge millions of unheard, unnoticed calls. An unheard, unnoticed call causes no injury. Even if such a call sounds under the TCPA, Congress cannot create Article III injuries from mere airwaves. *See Spokeo, Inc.* v. *Robins*, 136 S. Ct. 1540, 1550 (2016). Thus, when no one is home when the phone rings, the answering machine isn't triggered, and the phone has no caller ID to document the call, the plaintiff suffers no Article III injury. Here, more than a third of the calls SiriusXM made to landlines during the relevant period were coded to indicate that neither a person nor an answering machine picked up. A.18. The individualized inquiries required to determine the extent of a proposed class member's injuries, if any, "defeat[] predominance." *Bell Atl. Corp.* v. *AT&T Corp.*, 339 F.3d 294, 308 (5th Cir. 2003).

## CONCLUSION

Buchanan's motion for class certification should be denied.

July 30, 2018                                           Respectfully submitted,

                                                       */s/ Lee A. Armstrong*
                                                       Lee A. Armstrong
                                                         (admitted *pro hac vice*)
                                                         New York Attorney No. 2580793
                                                       JONES DAY
                                                       250 Vesey Street
                                                       New York, New York
                                                       Tel: (212) 326-3939
                                                       Fax: (212) 755-7306
                                                       Email: laarmstrong@jonesday.com

                                                       *Counsel for Defendant Sirius XM Radio Inc.*